SAMUEL B. DURYEA, Appellant, *against* THE MAYOR, ALDER-
MEN AND COMMONALTY OF THE CITY OF NEW YORK,
Respondent.

(Decided January 3rd, 1882.)

An old and unoccupied wooden house in the City of New York was at-
tacked in the day time on the day of a general election by boys of from
eight to seventeen years of age, who, numbering at first only three or four,
began tearing down and carrying away the stoop, and, increasing in
number to more than fifty, continued for an hour or longer to demolish
the building, until it was substantially wrecked, so that the owner was
subsequently compelled to take it down. They dispersed at the coming
of a policeman, and there was no indication of any intent to resist oppo-
sition by the public authorities or private citizens, nor was anything done
" to the terror of the people," the injury appearing to have been accom-
plished not with any common purpose, but rather to gratify individual
propensity. *Held*, that the city was not liable for the damages in an
action by the owner, under L. 1855, c. 428, giving such a right of action
" whenever any building," &c., " shall be destroyed or injured in conse-
quence of any mob or riot."

EXCEPTIONS taken at a trial term of this court, ordered to
be heard, in the first instance, at the general term.

On November 2nd, 1880, about ten o'clock in the morn-
ing, three or four boys began tearing down the stoop of an
old, unoccupied, wooden building, No. 171 Mercer Street,
belonging to the plaintiff. The number gradually increased
to from fifty to seventy-five, ranging in age from eight to
seventeen years. The house was substantially wrecked, and
subsequently taken down. This action was brought to recover
damages, under the Act of 1855, upon the claim that the prop-
erty was destroyed by a mob or riot, and the defendant
therefore liable. The court below dismissed the complaint,
directing the exceptions to be heard, in the first instance, at
the general terms.

*Edward J. F. Werder*, for plaintiff.—The law of 1855 is
a remedial statute meant for the benefit of the owners of prop-

erty injured or destroyed by riotous gatherings, and is to be construed liberally, and to effect the object.     Compensation rather than penalty is its motive, and the motive determines the rule of interpretation.     If three or more persons do an unlawful act of violence it is a riot.     The facts that the persons who may be witnesses were not alarmed, and that those engaged in the riot were in good humor, do not change the legal effect of the acts committed (*Turpin* v. *State*, 4 Blackf. [Ind.] 72 ; *Kiphart* v. *State*, 42 Ind. 273 ; *State* v. *Boies*, 34 Me. 236 ; *State* v. *Snow*, 18 Me. 345).     The owner was under no duty to call upon the peace authorities, for he had no knowledge that his property was about to be assailed (*Fly* v. *Niagara County*, 36 N. Y. 297 ; *Schiellein* v. *Supervisors*, 43 Barb. 490 ; 47 Barb. 447).

*William C. Whitney, E. Henry Lacombe,* and *Arthur H. Masten,* for respondent.—I. The court, in determining whether or not the present case is one in which the city should be held liable, should give to the words " mob or riot " the meaning which it deems to have been intended by the legislature, rather than apply to them the technical definitions of the common law.     Those definitions were framed by writers on criminal law, and the adjudications which follow them were made with reference solely to the punishment of the persons engaged in riotous proceedings.     The statute relates in no way to the criminal aspect of riots, but has for its object compensation for property destroyed thereby—its theory being that the municipality should respond in damages for neglect to provide secure protection of the property of its citizens (*Underhill* v. *Manchester*, 45 N. H. 214).     It will be urged that the statute, being remedial, should be most liberally construed ; it may be said with equal force, however, that as it imposed upon municipal corporations a liability unknown at the common law, it should receive à strict construction. Except in two contingencies, the statute makes the city an insurer against loss ; hence the courts should be cautious in extending the statute to cases not clearly within its provisions. In determining the cases intended by the legislature, it is

proper to consider probable consequences (*People* v. *Laimber*, 5 Denio, 9; *McKeen* v. *Delancey*, 5 Cranch, 32; *Haentze* v. *Howe*, 28 Wis. 293). Statutes are to be construed according to the intent of the legislature, even in the face of their language (*People* v. *Utica Ins. Co.*, 15 Johns. 380; *Jackson* v. *Collins*, 3 Cow. 96; *Tonele* v. *Hall*, 4 N. Y. 144). The legislature of 1855 did not contemplate making the city insurers against loss by riot, according to the old common law definition, nor according to the definition in the Penal Code (§ 449); its intention is to be found from the act itself, the word riot being thus interpreted to mean the concerted action of individuals defying authority in such a manner as to create general alarm.

II. The damage was not caused by a "mob or riot," as defined at common law. The acts held to constitute a riot at common law were such as were calculated to create terror in the minds of persons other than the rioters (Hawkins P. C. c. 65, § 1; 2 Colby's Crim. L. [1868], 94; Stephen's Comm. [7th ed., 1874], 254; Roscoe Crim. Evid. [7th Am. Ed., 1874], 901; Harris' Princ. Com. L. [1877], 101; Alison Princ. Crim. L. Scotland, c. 23; Russell Crimes [9th Ed., 1877], 376; 2 Benedict N. Y. Civ. & Crim. Justice [1878], 866; Wharton Crim. L. [1880], §§ 1537, 1539; May Crim. L. [1881], § 203; 2 Bishop Crim. L. [6th ed. 1877], 636; Stephen Dig. Crim. L. [1877], 41). Few cases can be found in which the question was directly presented as to whether or not the acts complained of were actually to the terror of the people. Whenever this point has been raised, however, the courts have held that this element was essential to the existence of a riot (*Reg.* v. *Langford*, Carr. & M. 602; *S. C. sub nom. Reg.* v. *Phillips*, 2 Moody Cr. Cas. 252). It has long been held in England that it was necessary in an indictment for riot to aver that it was *in terrorem populi* (*Rex* v. *Hughes*, 4 Carr. & P. 373; *Rex* v. *Cox*, Id. 530; *Reg.* v. *Soley*, 11 Mod. 115; Bishop Crim. L. § 1147). In most of the reported cases, however, the acts of the rioters were such that from their very nature the court could infer that terror could be caused (such were *Ratcliffe* v. *Eden*, Cowp. 485; *Greasley* v. *Higginbottom*, 1 East, 636;

*Reg.* v. *Harris*, Carr. & M. 661; *Reg.* v. *Simpson*, Id. 669). It was necessary, in order to constitute a riot at the common law, that the persons assembled should have an unlawful intent, or intent to resist authority (*U. S.* v. *Peaco*, 1 Cranch C. Ct. 601). But where, as in this case, there was direct evidence to show that it was not the intention of the assemblage to resist interference, their acts cannot be deemed to be a riot (*Reg.* v. *Jenkins*, 1 Cox Crim. Cas. 177).

III. These rules of the common law have not been qualified by any of the decisions of this state. An examination of the cases found in the New York reports shows that the question, as to whether the acts complained of were actually to the terror of the people, has not been directly raised. The facts in all of them, however, show that this element was unquestionably present in each instance (*Newberry* v. *Mayor*, 1 Sweeney, 369; *Levy* v. *Mayor*, 3 Robt. 194; *Sarles* v. *Mayor*, 47 Barb. 447; *Ross* v. *Mayor*, 4 Robt. 49; *Orr* v. *Brooklyn*, 36 N. Y. 661; *Darlington* v. *Mayor*, 2 Robt. 230; *Ely* v. *Supervisors*, 36 N. Y. 297; *Schiellein* v. *Supervisors*, 43 Barb. 490; *Solomon* v. *Kingston*, 24 Hun, 564).

IV. The plaintiff did not use reasonable diligence to prevent the damage of which he complains. In leaving a ruinous building unguarded and insufficiently secured on election day, he did not act as a man of ordinary prudence would have done (*Eastman* v. *Mayor*, 5 Robt. 398; *Blodgett* v. *Syracuse*, 36 Barb. 526).

V. The withdrawal of the case from the jury was not error. A case should always be taken from the jury when the evidence is so preponderating that a verdict would be set aside (*Davis* v. *Third Ave. R. R. Co.*, 41 N. Y. Super. Ct. 35; *People* v. *Police*, 14 Abb. Pr. 158; *Goelet* v. *Ross*, 15 Abb. Pr. 251; *Dickerson* v. *Wason*, 48 Barb. 414; *Besson* v. *Southard*, 10 N. Y. 236; *Godin* v. *Bank of the Commonwealth*, 6 Duer, 76; *Herring* v. *Hoppock*, 15 N. Y. 409; *Porter* v. *Havens*, 37 Barb. 343); especially where the defendant is a corporation (*Thrings* v. *Central Park R. R. Co.*, 7 Robt. 616; *Toomey* v. *London, &c. R. Co.*, 3 C. B. N. S. 146; see also Cooley Torts, 666; *Metropolitan R. Co.* v. *Jackson*, L. R. 3

Duryea *v.* Mayor, &c. of N. Y.

App. Cas. 193; *Ebersole* v. *Northern Central R. R. Co.*, 23 Hun, 118; *Clapp* v. *Hudson River R. R. Co.*, 19 Barb. 464; *Collins* v. *Albany, &c. R. R. Co.*, 12 Barb. 494). The judge might properly have withdrawn the case from the jury, if there had been merely an absence of proof of the existence of the two elements necessary to constitute a riot under the principles stated above. *A fortiori*, it was proper for him to do so when there was direct evidence showing their non-existence. (1) It was clear from the testimony of the plaintiff's witnesses that the persons constituting the assemblage in question had no mutual intent to resist any one who should oppose them in carrying out their designs; (2) their acts were not "such as to strike terror into the public mind."

BEACH, J.—[After stating the facts as above.]—I am of opinion that the correct solution of the question presented on this appeal, is found in the generally accepted legal definition of the terms mob or riot. Should the assemblage described in the evidence be rightfully designated by those terms, the liability of the defendants would necessarily result, and the disposition of the case by the court below be erroneous. In Hawkins' Pleas of the Crown, c. 65, § 1, a riot is defined to be " a tumultuous disturbance of the peace by three or more persons assembling together of their own authority, *with an intent mutually to assist one another against any who shall oppose them,* in the execution of some enterprise of a private nature, and afterwards actually executing the same, in a violent and turbulent manner *to the terror of the people,* whether the act be itself lawful or unlawful."

There is nothing in the proofs from which this court can conclude that the gathering was possessed of any intent to resist opposition by the public authorities, or private citizens. The only fact bearing at all upon the question, is that the assemblage dispersed upon sight of a single police officer, strongly indicating an entire submission to constituted authority. In the words of one witness, " they were occupied for an hour to an hour and a half before the officer came and ran them off." In addition there was nothing done to the " ter-

ror of the people," although a witness for the plaintiff testifies to having been put in fear, which consisted of seeing the boys and going inside his own house.

But considering the question upon a broader basis than is afforded by technical definition, it would be impossible to characterize the occurrence as anything but a piece of malicious mischief, accomplished not with any common purpose, but rather to gratify individual propensity. The legislature cannot have intended to impose liability in such cases, thus making the city an insurer of perfect quiet, and answerable for all damage from any breach of the peace by three or more persons. The law-making power does not inflict punishment of this character, that no vigilance can avoid or power prevent. If so, a practical impossibility is called for, and the necessity created of lining every street with policemen, so that three or more boys cannot break the windows of an unoccupied building, or indulge in any similar proceeding inflicting damage. There is no rule of construction which would warrant or uphold such an interpretation of the act. As said by Chief Justice DENIO in *Darlington* v. *Mayor, &c. of New York* (31 N. Y. 164), "the policy on which the act is framed may be supposed to be, to make good at the public expense, the losses of those who may be so unfortunate as, without their own fault, to be injured in their property by acts of lawless violence of a particular kind, which it is the general duty of the government to prevent."

In conclusion, I am of the opinion that the case at bar does not disclose acts of the kind contemplated by the legislature, or which it is the general duty of the government to prevent. The performance of such duty, would be impossible with regard to occurrences similar to the one described in this record. In this view consideration of the other exceptions is needless.

The dismissal of the complaint is affirmed, and judgment directed for the defendant with costs.

J. F. DALY, J., concurred.

Exceptions overruled, and judgment ordered for defendant, with costs.