JOHN ADAMSON, Appellant, *v.* THE CITY OF NEW YORK, Respondent.

MUNICIPAL CORPORATIONS — WHEN DESTRUCTION OF BUILDING BY CROWD DOES NOT CONSTITUTE RIOT AND RENDER CITY LIABLE FOR DAMAGES UNDER GENERAL MUNICIPAL LAW. The destruction of an unoccupied frame building by a varying crowd of young men and boys numbering from eight to thirty, there being no evidence of any purpose to accomplish the destruction by violence and in spite of any resistance, but on the contrary, it appearing that when a policeman approached, the crowd ran away, does not constitute the offenders guilty of riot within the meaning of section 449 of the Penal Code, so as to entitle the owner to recover from a municipality the value of the building under section 21 of the General Municipal Law (L. 1892, ch. 685), providing that a city or county shall be liable to a person whose property is destroyed or injured therein by a mob or riot for the damages sustained thereby.

*Adamson* v. *City of New York*, 110 App. Div. 58, affirmed.

(Argued March 15, 1907; decided April 9, 1907.)

APPEAL from an order of the Appellate Division of the Supreme Court in the second judicial department, entered February 1, 1906, which reversed a judgment in favor of plaintiff entered upon a verdict and an order denying a motion for a new trial and granted a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Paul Eugene Jones* for appellant. If the liability of the city is statutory, then the liability should be ascertained by following the definition of our statute as to what makes "a mob or riot." (*Regina* v. *Langford,* Carr. & M. 602; *Marshall* v. *City of Buffalo,* 50 App. Div. 149; *People* v. *Most,* 128 N. Y. 108; *Duryea* v. *Mayor,* etc., 10 Daly, 300.) At common law such an act as would make a trespass would make a riot if done by three or more acting in concert. (*Reed* v. *Gainsbury,* 4 D. & R. 250; 1 Hawkins Pleas, ch. 65, pp. 293–296; *Queen* v. *Soley,* 11 Mod. 116.) Proof of an intention to resist the civil authorities never was required to be shown in case of riot, either in civil action or criminal prosecution at common law. (*Sampson* v. *Chambers,* 4 Campb. 221; *King* v. *Chambers,* 1 Stark. 195; *Beatson* v. *Rushforth,* 7 Taunt. 45; *Reed* v. *Gainsbury,* 4 D. & R. 250; *Marshall* v. *City of Buffalo,* 63 App. Div. 603; *Rea* v. *Wood,* 2 Stark. 269; *Clark* v. *Burdett,* 2 Stark. 504; *King* v. *Chambers,* 1 Stark. 195; *Sampson* v. *Chambers,* 4 Campb. 221; *Newcastle* v. *Broxtowe,* 1 N. & M. 598.)

*William B. Ellison,* Corporation Counsel (*James D. Bell* and *James W. Covert* of counsel), for respondent. Plaintiff's property was neither destroyed nor injured by a mob or riot, but that destruction was brought about by a number of independent acts, constituting a separate crime for each individual, but not a general crime for which the city is made liable. (1 Stephen Hist. Cr. Law, 188; 2 Reeves Hist. Eng. Law, 122; 1 Pike's Hist. Crimes, 220; *Duryea* v. *Mayor,* etc., 10 Daly, 300; *Marshall* v. *City of Buffalo,* 50 App. Div. 149; 63 App. Div. 603.)

HISCOCK, J. Plaintiff was the owner of a two-story frame building in the borough of Brooklyn. It had been unoccupied for three or four months prior to November 5, 1901,

which was election day, and during that period had been subjected to various depredations which left it in a somewhat dilapidated condition. Upon the latter day it was practically demolished by a varying crowd of young men and boys estimated by different witnesses to have numbered from eight to thirty. The demolition took place in the daytime and the persons who accomplished it are said by one of the witnesses to have had an axe and a crowbar, and by others simply to have had some rope and pieces of pipe and timber with which to pry the building apart. As soon as one of the trespassers had secured a piece of the house he ran away with it and another took his place. There was no disturbance except such as was naturally incidental to such a proceeding and there was no evidence of any purpose to accomplish. the destruction by violence and in spite of any resistance which might be offered, but, upon the other hand, when a policeman appeared the crowd ran away. At the same time in other portions of the police precinct boys and men were stealing wood for bonfires.

Upon these general facts plaintiff has sought to hold the respondent, the city of New York, liable for the value of his building upon the ground that it was destroyed by a mob or riot, basing his action upon section 21, chapter 685 of the Laws of 1892, known as the General Municipal Law, which in part reads as follows: " A city or county shall be liable to a person whose property is destroyed or injured therein by a mob or riot for the damages sustained thereby."

The learned Appellate Division has decided that there was no such evidence of a mob or riot as would entitle the plaintiff to recover, and we agree with this view.

Section 449 of the Penal Code defines riot as follows: " Whenever three or more persons, having assembled for any purpose, disturb the public peace, by using force or violence to any other person, or to property; or threaten or attempt to commit such disturbance, or to do an unlawful act by the use of force or violence, accompanied with the power of immediate execution of such threat or attempt, they are guilty of riot."

17

In interpreting this statute which defines an offense well known at common law, we are entitled to seek aid from common-law definitions of such offense. (*People* v. *Most,* 128 N. Y. 108, 113.)

A frequently quoted definition of the term riot is that given by Hawkins in his " Pleas of the Crown," namely : " A tumultuous disturbance of the peace by three persons or more assembling of their own authority with an intent mutually to assist one another against any one who shall oppose them in the execution of some enterprise of a private nature and afterwards actually executing the same in a violent and turbulent manner to the terror of the people whether the act intended were of itself lawful or unlawful."

Greenleaf adopts a definition evidently based upon that given by Hawkins and to the effect that to constitute a riot " It is necessary that there be three or more persons tumultuously assembled of their own authority with intent mutually to assist one another against all who shall oppose them in the doing either of an unlawful act of a private nature or of a lawful act in a violent and tumultuous manner."

Interpreting the statute upon which plaintiff bases his right of action in the light of the provision quoted from the Penal Code and assisted as we may be by the foregoing common-law definitions, we think that the evidence fails to disclose the existence of a mob or riot at the time plaintiff's property was destroyed. As we use and contemplate those terms we naturally think of an unlawful assemblage of people of threatening attitude acting in concert with disorder and violence and determined to accomplish some injury to person or property in spite of any resistance which may be offered. It is apparent, of course, that not every illegal interference with property by three or more people would come within the definition of a mob or riot, but that many such infractions of law would constitute trespass or larceny or some kindred offense. The acts complained of in this case, in our opinion, come within the latter category rather than within the definition of the offense which plaintiff has sought to establish.

The boys and men who perpetrated them in constantly shifting numbers were evidently stealing and carrying away the material of plaintiff's house for some ulterior purpose not fully disclosed, and their conduct in dispersing whenever a policeman appeared indicated any other purpose than that of proceeding with force or violence to accomplish their purpose, acting in concert and mutually assisting one another against any one who should oppose them.

We think the case can clearly be distinguished from those which have been called to our attention as authorizing a recovery.

In *Solomon* v. *City of Kingston* (24 Hun, 562) it appeared that a crowd which had assembled at a fire broke into plaintiff's store and carried away his goods and that these acts were accompanied by violence toward those who were attempting to protect the property against the assembly. It was scarcely contended upon the part of the defendant that the gathering which finally caused the injury to plaintiff's property did not constitute a mob or a riot, but the defense was rather based upon other considerations which are not involved here.

In *Marshall* v. *City of Buffalo* (50 App. Div. 149) it was proven that a crowd of men, women, boys and girls appeared upon the premises of the plaintiff with shovels, axes and other tools and commenced to demolish the building and carry the material away in wagons; that from 100 to 200 people were engaged in the work of destruction which continued for three days until only the foundations were left, and it was held that it might be fairly inferred and found from the evidence that they were executing the common purpose of unlawfully demolishing and removing the building and that there was a preconcerted plan to that effect upon the part of many people, and that the jury were entitled to draw the conclusion that the buildings in question were unlawfully and with force and violence demolished and ruined by a riotous and disorderly mob in the execution of a common purpose and in defiance of law and order.

, The case of *Regina* v. *Langford* (Carrington & Marsh-

man's Reports, 602) involved an indictment under a statute for riotously and feloniously demolishing a house. The statute contained no definition of the term riot and the court resorted to the one drawn from Hawkins which has already been quoted. It was held that a riot must be attended with circumstances of terror to the people and that this essential element was established in the case at bar and hence a conviction was allowed.

In each of these cases there was present an element of concerted action and violence in attacking those who offered resistance to the execution of an unlawful plan, or of a large and tumultuous gathering against public peace and order which carried out its unlawful destruction of property with preparation and deliberation, or of unlawful conduct calculated to inspire terror and, therefore, coming within the particular statutory definition there applicable, and none of which features are here present.

This case, upon the other hand, comes within the principles adopted in *Duryea* v. *Mayor, etc., of N. Y.* (10 Daly, 300 ; affd., 100 N. Y. 625) where it was held that the conduct of a collection of boys and young men who destroyed a building and who showed no intent to resist opposition by the public authorities or private citizens, but upon the other hand dispersed at the coming of a single police officer, was to be regarded as malicious mischief and trespass rather than the acts of a mob and riot. The distinguishing facts of that case are quite similar to those presented here and we think that it outlines a more correct course for us to follow than would be adopted if we should hold that the acts now being complained of were of such a character as to impose a liability upon the municipality for the destruction of property by mob violence.

The order appealed from should be affirmed and judgment absolute rendered upon the stipulation, with costs in all the courts.

CULLEN, Ch. J., GRAY, VANN, WERNER, WILLARD BARTLETT and CHASE, JJ., concur.

Order affirmed, etc.