STATE v. ALFRED HOFFMAN, LAWRENCE HOGAN, DELL LEWIS AND WES FOWLER.

(Filed 20 August, 1930.)

**1. Riot A a—Elements of offense of riot.**

The offense of riot is composed of the three elements of unlawful assembly, intent to mutually assist against lawful authority, and acts of violence: and *Held*, the evidence in this case plainly and unequivocally discloses the essential ingredients of the offense.

**2. Riot C b—Evidence of defendants' guilt of aiding and abetting in riot held sufficient to be submitted to the jury.**

Evidence in a prosecution for riot tending to show that one of the defendants was a leader of strikers of a mill, and that he incited and

brought several automobile loads of strikers to the scene of the riot who were armed with sticks and joined the crowd .and participated in. the disturbance, and that the other defendants incited 'the members of 'the crowd and actively participated in the ensuing fight, with evidence to the contrary that the tumult resulted from acts of violence by the officers, and that the defendants were acting as peacemakers therein : *Held*, the evidence creates an issue of fact as to the defendants' guilt as aiders and abettors in the offense which was properly submitted to the jury for its determination.

3. **Same—Evidence of inflammatory speech of one of defendants held competent in connection with evidence of his participation in the riot.**

Evidence of the declaration of one of the defendants on trial for the offense of riot, made some weeks before the disturbance, of an inflammatory and threatening nature, is held competent against him in connection with evidence of his participation in the disturbance.

4. **Criminal Law C b—Party inciting, encouraging, or assisting the actual perpetration of a crime is guilty as aider and abettor.**

Mere presence, even with the intention of assisting in the commission of a crime, does not render a party an aider or abettor therein unless the intention to assist is communicated to the perpetrator, but if a party, being present, does something that will incite, encourage, or assist the actual commission of a crime he is guilty as an aider and abettor.

CRIMINAL ACTION, before *Cowper, Special Judge,* at November Term, 1929, of McDOWELL.

The defendants, Hoffman, Fowler, Hogan, Russell, Lewis and Hall were indicted upon a bill containing four counts. The first count charged engaging in a riot; the second count charged resisting the sheriff of McDowell County in the performance of his duties; the third count charged resisting the deputy sheriff of McDowell County while in the discharge of his duties, and the fourth count charged resisting the constable of Marion Township, McDowell County, while in the performance of his duties.

The jury convicted Hoffman, Hogan, Fowler and Lewis. By the judgment entered, Hogan, Fowler and Lewis were ordered to be confined in the common jail of McDowell County for a period of six months and assigned to work on the public roads. Hoffman was sentenced to jail for a period of thirty days and fined the sum of $1,000 and costs.

The verdict as shown by the record is as follows : "The jury returned a verdict of guilty as to all four of the defendants on the count in the bill charging them with rioting and not guilty as to all other counts in the bill. The jury recommends the mercy of the court."

The names of the four defendants convicted do not appear in the verdict at all. The judgment is pronounced against Hogan, Fowler, Lewis and Hoffman. Hence we assume that the other two defendants were acquitted.

The evidence tended to show that there was a strike in progress among the workmen of the Clinchfield Mill and other mills in Marion, North Carolina. On 30 August, 1929, a man named Ruppe came from Caroleen, Rutherford County, to work in the mill. He brought his furniture with him and at the instance of officials of the mill placed his furniture in a house belonging to the Clinchfield Mill. This house is situated near Highway No. 10, which is commonly referred to as the main street of North Carolina, running from the ocean to the mountains. The mill road branches off from No. 10, and the house in which Ruppe moved his furniture was about 300 yards from said highway. Ruppe left his furniture in the house and the house was closed. He then returned to his home in Rutherford County. That afternoon about three o'clock it was discovered by the officials of the mill that the house had been broken into and the furniture dumped out on Highway No. 10 at a point at or near the mouth of the mill road. "It was just on the edge of the concrete and against the bank." Officials of the mill called the sheriff of McDowell County to put the furniture back in the house. Sheriff Adkins took with him his deputies, Hendley, Tate, Gowan and Halliburton, and also Robbins, the constable of Marion Township. Arriving upon the scene and at the place where the furniture was lying in the road, the sheriff and his deputies found 75 or 100 people standing on Highway No. 10 at the mouth of the mill road, blocking the same. As soon as the sheriff and his deputies appeared the crowd surged about them. The defendants, Fowler and Lewis, were in this surging crowd and surged with them. Fowler had an open knife in his hand and Lewis was armed with a stick 2½ by 3 feet long. Eighty per cent of the people in the crowd who were blocking the road had sticks.

The sheriff secured a wagon and a driver from the mill, loaded the furniture on it and attempted to carry it back to the house from which it had been taken. When the furniture had been loaded Fowler approached the sheriff and said, "What in the hell are you going to try to do now?" At that time Fowler had an open knife in his hand. The sheriff grabbed at Fowler's hand and he jerked the knife back and put it in his pocket. Thereupon the sheriff arrested Fowler and placed him in a car in charge of deputies Hendley and Gowan and told them to drive through the crowd. Fowler kept pulling back, "saying he hadn't done anything." In the meantime the crowd had increased to about 200, blocking the entire road and "hollering and cursing," and saying "They are not going to get through this crowd." The road leading into the village was blocked. When the sheriff's car in which Fowler had been placed began to move through the crowd the sheriff walked behind it and ordered the wagon loaded with furniture to follow him. Thereupon the crowd closed together and when the team started they proceeded "to

beat the mules and throw rocks at the driver. They hit the mules with sticks, threw rocks at the driver and cursed. . . . They were hollering, 'Damn scabs are not coming in. We are not going to let them come in and everybody hold your ground.' They shouted to the sheriff that he had no damn business down there and that he had better get the hell away from there; they were not going to let that stuff go in." The sheriff kept telling them they had better stand back and let the team through, as they had no right to block the highway. At this time the defendant Hogan appeared upon the scene and began conferring with the crowd going "from group to group." After Hogan was there talking to the crowd they continued to keep the road blocked, hollering. At this time the crowd had increased to about 300. When the sheriff's car, carrying the defendant Fowler to jail, was passing through the crowd they beat on the car several times. A milkman named Houk came along the road to deliver milk to his customers. He saw the sheriff and his deputies near the mouth of the road. He was stopped by two men armed with sticks. When he attempted to pass through the crowd "they began beating on my truck." The defendant Hogan was present at that time and the crowd around him had sticks. The crowd was yelling and hollering and cursed the milkman, or as he testified: "Called me all kinds of stuff, scabs and everything of that kind; I couldn't say, was so much hollering and yelling, couldn't tell what they were all saying."

Seeing that he and his deputies were overpowered and that the road was thoroughly blocked by the surging crowd and that it would be impossible to move the furniture, the sheriff called for troops then stationed in Marion. Before the arrival of the troops the defendant Hoffman appeared upon the scene. The sheriff testified: "I saw Mr. Hoffman's car drive up to the switch down there two or three times, I think three times, and bring a load of folks and get out of his car and come and join the crowd. I couldn't say how many people he brought in his car, three, four or five times. It is a Buick coupe. Those people had sticks, lots of them; when they got out of his car they would go down in the crowd with their sticks. It was a regular turmoil. They were hollering, everybody was hollering and cursing, and ever once and a while a rock would ziz by you." Just as the troops came in sight the defendant Hogan came into the crowd and the crowd began yelling. Hogan said something to the crowd and part of the crowd in front began to put their sticks on their shoulders and began to march up and down in front of the crowd and holler, "Bring on the troops, to hell with the troops." Captain Lyda was commanding officer of the troops. When he arrived at the scene with his soldiers he "told the crowd to move back repeatedly." In response to that "they whooped, jeered and called us scab lovers and paid gunmen," said, "Here comes the boy scouts, wooden

soldiers." The troops undertook to push the crowd back so that the mules and wagons could move forward. Some of the men walking with the wagon were kicked and the mules were struck with sticks. At that time Hogan came up and said to Captain Lyda, "We will take charge of the situation." The captain ordered him to stand back. Hogan replied "that he had grown to the ground, and if we wanted him to move back we would have to saw him off." The captain said, "I finally drew my gun and put it into Hogan's stomach and told him to move back. Until that time I had not been able to move him." The sheriff was hit with a stick and deputy Robbins was hit on the head by a brick.

The foregoing is a brief summary of the evidence offered in behalf of the State. The defendants offered the testimony of more than twenty-five witnesses contradicting the evidence of the State and tending in every way to exculpate the defendants.

From the judgments pronounced the defendants appealed.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*A. Hall Johnston and Thomas A. Jones for defendants.*

BROGDEN, J. A voluminous record and a mass of conflicting testimony present two questions of law:

1. Was there sufficient evidence of a riot as defined by law to be submitted to the jury?

2. If so, was there sufficient evidence to be submitted to the jury that the appealing defendants aided and abetted therein?

The offense of riot has been considered by this Court in three cases, to wit: *S. v. Stalcup,* 23 N. C., 30; *Spruill v. Life Ins. Co.,* 46 N. C., 126; *S. v. Hughes,* 72 N. C., 25. In the *Stalcup* case a riot was defined "to be a tumultuous disturbance of the peace, by three persons or more, assembling together of their own authority, with an intent mutually to assist one another against all who shall oppose them, and afterwards putting the design into execution, in a terrific and violent manner, whether the object in question be lawful or otherwise. An indictment for a riot, always avers that the defendants unlawfully assembled. And this averment must (we think) be proved on the trial, as well as the subsequent riotous acts of the defendants, before they can be convicted of a riot." In other words, the offense is composed of three necessary and constituent elements, to wit: (a) unlawful assembly; (b) intent to mutually assist against lawful authority; (c) acts of violence.

A perusal of the evidence discloses plainly and unequivocally the essential ingredients of riot, and hence this phase of the case will not be debated.

The second question of law involves aiding and abetting. Mere presence, even with the intention of assisting in the commission of a crime, cannot be said to have incited, encouraged, or aided the perpetrator thereof, unless the intention to assist was in some way communicated to him; but if one does something that will incite, encourage, or assist the actual perpetration of a crime, this is sufficient to constitute aiding and abetting. *S. v. Hart,* 186 N. C., 582, 120 S. E., 345; *S. v. Dail,* 191 N. C., 234, 131 S. E., 574; *S. v. Tyndall,* 192 N. C., 559, 135 S. E., 451; *S. v. Baldwin,* 193 N. C., 566, 137 S. E., 590.

In order to apply the well settled principles of law it is necessary to recur briefly to the facts with reference to the participation of each of the appealing defendants in the riot.

Alfred Hoffman: This defendant was a recognized mouthpiece of the employees of the mill. He made several speeches to the workmen, and apparently they were depending upon his counsel and advice. The evidence for the State tended to show that at a meeting about three weeks before the date of the riot this defendant, in a public utterance, had said, "Don't let any one move into the Clinchfield mill village. Watch Rutherford County and South Carolina cars especially." There was further testimony from the State to the effect that at the same meeting over which the defendant Hoffman was presiding, he said: "If anybody gives out anything, they will take a long ride and won't come back." Hoffman testified as a witness in his own behalf that one Herling, a newspaper reporter was making some sort of a speech and that he (Hoffman) sent for the defendant Hogan, "and I told him to go down there and make that damn fellow keep his mouth shut, or something to that effect; I don't know just exactly what I said, but my effort was to get him quiet; he was speaking when I got there."

This testimony from the defendant tends to corroborate other evidence offered by the State to the effect that Hoffman was regarded as a leader by the workmen.

The sheriff testified that during the riot Hoffman made two or three trips with his car, stopping at a point near the scene of the disturbance, each time bringing a load of people armed with sticks. "When they got out of his car they would go down in the crowd with their sticks."

Another witness for the State testified: "Those folks Hoffman brought there, when they got out of his car, they walked into the crowd and took hand or part in the crowd, hollering, yelling, and cursing like the rest were doing at that time. . . . There was not a thing between Hoffman and the crowd to keep him from seeing what was going on there. . . . I would say, practically all of them in the crowd I saw Hoffman bring up there had sticks."

Hogan: The State offered evidence that Hogan went down to the Marion Mill and requested a man named Bryson who was on the picket line "to get the gang of fighters and go to Clinchfield." Hogan was present in the crowd that blocked Highway No. 10. He went from group to group talking to various persons at the time the tumult was in progress. When the troops arrived he declined to move so that the troops could pass until the captain of the military company drew his pistol. Hogan and Hoffman were closely associated in leadership of the workmen. Hoffman lived at Hogan's house and Hogan "was in charge of the relief and supervised the giving of requisition slips to the strikers." Hoffman testified: "I have made quite a few speeches around here as an officer of the organization. I depended on Hogan."

Lewis: The sheriff testified: "Del Lewis was right in the crowd helping to block the highway, kept us from getting back in the house with this stuff through the street. . . . He made all the racket he could."

Deputy Sheriff Hendley testified that Lewis beat upon the truck of the milkman who was trying to pass through the crowd. Lewis also "barked" at the officers. The sheriff said: "Lewis is a big barker."

Fowler: This defendant had an open knife in his hand and was arrested by the sheriff.

The foregoing excerpts from the evidence offered by the State warranted the trial judge in submitting the cause to the jury. The defendants, each for himself, denied any and all participation in the riot and offered testimony of many witnesses tending to show that they were present as peacemakers and not as stirrers-up of strife; and furthermore, that the whole tumult resulted from acts of violence committed by the officers upon women who were in the crowd, and that this conduct created the tumultuous scene disclosed by the evidence. However, the evidence in its totality produces a clear-cut issue of fact and under our system of law issues of fact must be determined by a jury.

Exception was taken to the introduction of the declaration of Hoffman at a meeting some three weeks before 30 August, 1928, to the effect that cars coming from Rutherford should be watched, and that if anybody told anything "they would take a long ride." Hoffman denied the making of any such declaration. There is no suggestion that the other defendants approved the declaration. This evidence would certainly be competent against Hoffman in connection with his conduct at the time of the riot in bringing various parties of men to the scene, most of whom were armed with sticks.

No error.