# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 98-CA-00380-SCT

*JEAN J. BLACKLEDGE*

*v.*

*OMEGA INSURANCE COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/06/1998 |
| TRIAL JUDGE: | HON. ROBERT LOUIS GOZA, JR. |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DWIGHT HOOD |
| | CRYMES G. PITTMAN |
| | C. VICTOR WELSH, III |
| ATTORNEYS FOR APPELLEE: | CHARLES GREGORY COPELAND |
| | PATRICIA H. COTTINGHAM |
| | GREGORY L. KENNEDY |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | AFFIRMED - 08/12/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: 09/02/1999 | |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE FACTS

¶1. This appeal centers entirely upon the interpretation of certain undefined terms under an insurance contract between appellee, Omega Insurance Company (Omega), and appellant, Jean J. Blackledge. On September 21, 1994, Omega issued a dwelling policy for residential rental property to Blackledge for a house located on 160 Shady Lane Street (later known as Mary Myles Road) in Brandon, Mississippi. Ms. Blackledge had rented out this property, but was not receiving payment from her tenant. When she visited the dwelling to speak with the lessee, she found massive damage to the home. On February 3, 1995, appellant made a report to the Rankin County Sheriff's Office concerning the devastation. The investigator's report listed the damage to the house:

> This investigator observed holes in the Sheetrock walls, two exterior doors removed and the wooden front porch was torn off and missing. This investigator also observed that defecation was strewn throughout the house and all the windows were broken out. The exterior corner molding was torn off

and destroyed. The bottom edge of the exterior shingles were broken off and missing. Also noted missing was the hot water heater. The carpet throughout the house was pulled up, defecated on and destroyed.

"Destruction of Private Property!"

¶2. The investigation led by Deputy Greg Ecklund yielded no witnesses to the interior damage nor was an actual date of the destruction established as Blackledge had not inspected her property since before the previous Christmas. Statements by some of the neighbors indicate:

These people occupied the premises for months. They were selling drugs. They would stand in the front yard and yell at traffic passing along the street. . . . They were constantly gathered together disturbing the peace and acting in a loud and boisterous manner. They were causing a lot of trouble. Residents of the neighborhood could not rest. You could not sleep because of the noise they were making. . . . When responding to the complaints, law enforcement would drive up, and these people would scatter to the woods. When the police left, they would immediately come back to the premises.

¶3. By a letter dated February 2, 1995, Blackledge made a claim for damages to Omega. She contends that her claim falls under the extended coverage of her policy, specifically as a "civil commotion" and under other applicable provisions. Omega subsequently denied this claim on March 1, 1995.

¶4. On February 3, 1997, Omega filed its complaint for Declaratory Judgment alleging that the insurance policy owned by Ms. Blackledge did not cover damage done to her property on or about January 31, 1995. Omega contended that the damage to Blackledge's property was the result of burglary, vandalism, or malicious mischief, which was not covered under the policy. Conversely, Blackledge contended that the damage was the result of a riot or civil commotion which would be covered by her policy. Omega subsequently filed its motion for Summary Judgment which was granted on February 11, 1998 after a finding that there was no issue of material fact as to the language of the coverage under the insurance policy. Blackledge appeals to this Court, assigning as error,

### I. WHETHER THE TRIAL COURT JUDGE PROPERLY GRANTED DEFENDANT'S MOTION FOR SUMMARY JUDGMENT CONCERNING THE INSURANCE COVERAGE ISSUE.

¶5. We have continually held that Summary Judgment under Rule 56 M.R.C.P. cannot be proper when a genuine issue of material fact exists. *Brown v. Credit Center, Inc.*, 444 So.2d 358 ( Miss. 1983); *Owen v. Pringle*, 621 So.2d 668 (Miss. 1993). However, the rule itself demands diligence upon the part of the nonmoving party. An "adverse party may not rest upon the mere allegations or denials of his pleadings. . ." *M.R.C.P. 56 (e)*, and the nonmover "must establish a genuine issue of material fact by means allowable under the Rule." *Lyle v. Mladinich*, 584 So.2d 397, 398 (Miss. 1991). When this Court is faced with an appeal of summary judgment, we must review the evidence *de novo*. *Allen v. Mac Tools, Inc.*, 671 So.2d 636 (Miss. 1996).

¶6. Appellant asserts that without a legally recognized definition of the terms riot and civil commotion, that a genuine issue must exist. This premise is a weak defense and is not necessarily true. Courts are often charged with interpreting enigmatic areas within the law. This is the primary function of the judicial branch. Though clearly written statutes are preferred, in the absence of such, we, as judges, must apply consistent

legal principles bound by common sense. The trial judge in the case *sub judice* did not have to define the elements of a riot. He merely was faced with determining whether or not there had actually been one. In coming to his conclusion, the judge reviewed the evidence before him and found that Ms. Blackledge had failed to establish that anything other than malicious mischief or vandalism had taken place. Our task, however, is not so simple. This Court must determine what exactly a riot or civil commotion is, so that we then may review the court below and determine if error was indeed committed.

¶7. When terms in an insurance contract are ambiguous, the interpretation of those terms falls to the court. *McFarland v. Utica Fire Ins. Co.*, 814 F.Supp. 518 (S.D. Miss. 1992). This is so because holders of insurance policies are not expected to be "word-smiths, schooled in the craft of lexicology," and because the law disfavors "subtle definitions of common words which but promise to confuse even the educated and frustrate the unlearned." *Id.* at 525. When we determine the meaning of these words, we have held that "terms used in an insurance policy should be understood in their plain, ordinary, and popular sense rather than in a philosophical or scientific sense." *Hart v. North Am. Accident Ins. Co.*, 154 Miss. 400, 405, 122 So. 471, 472 (1929). In the case *sub judice*, we have two lay opinions in evidence which should indicate the ordinary interpretation of the word. Undersheriff Pennington testified that he was very familiar with the neighborhood in question and knew of no riots. Additionally, Deputy Ecklund testified that his investigation did not reveal any evidence of a riot or civil commotion. Certainly these members of law enforcement, whose job it is to quell civil unrest, would recognize a riot if one did in fact occur. It is not enough for us, however, to say that we know a riot when we see it. We must attempt to define the term to avoid further confusion.

¶8. Various definitions of riot abound in American jurisprudence and elsewhere. Mississippi, however, has a dearth of case law in this area. Though certainly not binding upon us, we think it wise to consult the ultimate authority, English common law, from whence the term originated. Hawkins in his ***Pleas to the Crown*** defines a riot as:

> A tumultuous disturbance of the peace by three or more persons assembling together of their own authority, with an intent mutually to assist one another against any one who shall oppose them in the execution of some enterprise of a private nature, and afterward actually executing the same in a violent and turbulent manner, to the terror of the people, whether the act itself was lawful or unlawful.

*Id.* cited in *Walter v. Northern Ins. Co. of New York*, 18 N.E.2d 906, 908 (N.Y. 1938). Another definition from the mother country states:

> It is necessary that there be three or more persons tumultuously assembled of their own authority with intent mutually to assist one another against all who shall oppose them in the doing either of an unlawful act of a private nature or of a lawful act in a violent and tumultuous manner.

*Greenleaf on Evidence*, 16th ed., sec. 216, cited in *Walter v. Northern Ins. Co. of New York*, 18 N.E.2d 906, 908 (N.Y. 1938). To constitute a riot, it is not enough that criminal activity be seen or overheard. Nor can a stealthy act of destruction escalate to riot, even if the destruction causes a later public disturbance. *Providence Washington Insurance Co. v. Lynn*, 492 F.2d 979 (1st Cir. 1974). ¶9. As we formulate our definition, we acknowledge that riots or civil commotions can vary in size and intensity, and that it is difficult to devise a meaning that will cover every situation. This being said, we recognize at least four necessary elements, 1) unlawful assembly of three or more people (or lawful assembly that due to its violence and tumult becomes unlawful), 2) acts of violence, and 3) intent to mutually assist against lawful

authority. The common law clearly indicates that lawful authority is not limited to official law enforcement, but extends to those whose rights are or may be injured and who seek to protect those rights. In addition, there must be some degree of 4) public terror. We include this element to prevent incorrect prosecution under riot, when a more fitting charge is available, and the crime or violence is of a more limited, private nature. Without the element of public terror, any minor public disturbance could legally be a riot. Though not identical, several of these elements have been adopted by our sister state in *State of North Carolina v. Hoffman* and elsewhere. 154 S.E. 314, 316 (N.C. 1930).

¶10. Turning once again to the case at hand, the alleged rioters satisfy the elements of unlawful assembly and violent action due to their trespass in and destruction of the home. Appellant argues that there was also public terror, yet those neighbors who were allegedly terrorized continued to live in their homes while this activity continued for months. Their main complaint was that they had trouble sleeping, not from fear, but due to the noise. This Court will never apply legal logic that is totally devoid of reason. Obviously, the terror to the neighborhood was not enough for the area residents to flee or substantially fear for their lives or property, which would be a likely response to a true riot. Rather, it seems to be more of an inconvenience than anything. As to the final, yet most important, element, there is no evidence of mutual assistance against lawful authority. Quite to the contrary, the witnesses upon which appellant relies indicated that when law enforcement would respond to their complaints, these trespassers would scatter to the woods at first glimpse of the police. This action is not indicative of coordinated resistance. In a similar case, *Adamson v. City of New York*, 80 N.E. 937 (N.Y. 1907), a crowd virtually demolished a building, and upon the approach of police, the assembly immediately dispersed. The trial court found this to be trespass and larceny rather than a riot. In light of our test, the riot which Blackledge alleges to have occurred cannot be recognized as such when it fails these last two elements.

¶11. As for the term "commotion," *Black's Law Dictionary*, defines it as an "infraction of civil order not attaining the status of war or an armed insurrection." *Id.* 5th Ed. at 253. This is a less involved definition but is essentially the same as for riot. We find that the terms riot and (civil) commotion are legally synonymous and the same standard should be used to determine both.

¶12. We are not unsympathetic to Ms. Blackledge's loss. Yet we may not ignore the fact that she chose the types of perils she wanted to insure her property against. Even the most cursory glance at the policy statement reveals the classifications of coverage she had opportunity to obtain. She elected "Fire" and "Extended Coverage," but decided to save money in premiums by opting against "Vandalism or Malicious Mischief." Unfortunately for her, this claim falls squarely under the one type of coverage she chose to forego. For her lack of foresight, we cannot punish her insurer.

## CONCLUSION

¶13. Despite the lack of an accepted definition for the terms riot and civil commotion, the trial court used sound judgment in construing the terms according to common parlance. Hence, the trial court's finding that no genuine issue as to a material fact existed was proper. As a result, we affirm the grant of summary judgment in favor of Omega.

¶14. **AFFIRMED.**

**PRATHER, C.J., BANKS, SMITH, WALLER AND COBB, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J.**

**PITTMAN, P.J., NOT PARTICIPATING.**


**McRAE, JUSTICE, DISSENTING:**

¶15. This case stems from the insurance claim of Jean J. Blackledge for damages to her property resulting from an alleged riot on her property. Blackledge's insurance policy provided coverage for a "riot" or "civil commotion" (neither term was defined in the policy) but not for malicious mischief or vandalism. The trial court granted summary judgment for her insurer, Omega, on the grounds that the undisputed facts did not rise to the level of a riot or civil commotion. Because I believe there were facts sufficient to make out a jury question as to whether there was a riot or civil commotion, I dissent from the majority's opinion upholding summary judgment for Omega.

¶16. Blackledge's claim arose when she discovered that a house she owned but rented out had been extensively damaged; the porches were torn off, wood was torn out, holes were knocked in the walls, and the back bedroom had been used as an outdoor toilet. Upon discovering the damage, Blackledge made a report to the Rankin County Sheriff's Department. The report states:

> Complainant stated that she owns a dwelling house at 160 Mary Myles Road in Brandon, MS. Complainant stated that unknown individuals had torn the house up and complainant is currently in the process of attempting to sale the house. This investigator and complainant went to the address of 160 Mary Myles Road and viewed the damage. This investigator observed a yellow shingled house with white wooden framed windows. This investigator observed holes in the sheetrock walls, two exterior doors removed and the wooden front porch was torn off and missing. This investigator also observed that defecation was strewn throughout the house and all the windows were broken out. The exterior corner molding was torn off and destroyed. The bottom edge of the exterior shingles were broken off and missing. Also noted missing was the hot water heater. The carpet throughout the house was pulled up, defecated on and destroyed.

> "Destruction of Private Property"!

¶17. The Under-Sheriff of Rankin County, Ronnie Pennington explained that the area in which the house was located was well known for drug deals and that some of the drug dealers used lumber from the home to burn fires to keep warm at night.

¶18. Two neighbors provided affidavits to the effect that the house had been inhabited by drug dealers whose homemaking abilities were far less than Martha Stewart's:

> [They] would stand in the front yard and yell at traffic passing along the street. They would stop cars driving down the street. They would tear wood off the dwelling and burn it in the front yard to keep warm. When it rained they would carry their activities in to the house until it quit raining. They built a fire once in the stove in the house trying to cook in it. They would break out windows in the house with rocks and bricks.

¶19. As the majority indicates, there are no Mississippi opinions defining the terms "riot" or "civil commotion." The **Random House Webster's College Dictionary** defines a riot as "a disturbance of the

public peace by three or more persons acting together in a violent or tumultuous manner." *See* **Random House Webster's College Dictionary** 1161 (1991). The majority opinion defines the word so as to include four elements: 1) unlawful assembly of three or more people (or lawful assembly that due to its violence and tumult becomes unlawful), 2) acts of violence, and 3) intent to mutually assist against unlawful authority, and 4) some degree of public terror. I believe that under either definition of riot, reasonable jurors presented the sworn statements provided by Blackledge could find that the damage to Blackledge's property was caused by a riot and, thus, that the trial acted erred in granting summary judgment for Omega.

¶20. The majority acts precipitously in upholding summary judgment for the insurer in this case. Remember, Rule 56 motions should be used sparingly lest we violate the right to trial by jury as guaranteed by both the Mississippi and the United States Constitutions. *Russell v. Orr*, 700 So.2d 619, 624 (Miss. 1997) (summary judgment must be carefully imposed); *Hurst v. Southwest Miss. Legal Servs. Corp.*, 610 So.2d 374, 384 (Miss.1992) ("Trial judges must be sensitive to the notion that summary judgment may never be granted in derogation of a party's constitutional right to trial by jury"), *overruled on other grounds, Rains v. Gardner*, 731 So.2d 1192 (Miss. 1999); *Martin v. Simmons,* 571 So.2d 254, 258 (Miss.1990) (summary judgment is a tool which "should be used wisely and sparingly"); *Pope v. Schroeder*, 512 So.2d 905, 908 (Miss.1987) ("[S]ummary judgment should not be used to snuff out a litigant's right to a trial unless it is appropriate under the rule.").

¶21. "Before summary judgment is granted, it must be determined whether reasonable jurors could not differ on the factual questions in issue." *Carpenter v. Nobile*, 620 So.2d 961, 965 (Miss.1993); *Sanford v. Federated Guar. Ins. Co.*, 522 So.2d 214, 217 (Miss.1988). The majority admits that the evidence provided by Blackledge was sufficient to show the elements of both unlawful assembly and violent action but failed to prove either public terror or mutual assistance against lawful authority. I disagree. The statements were enough to make out a jury issue as to these elements. At the very least, what is meant by "public terror" and "mutual assistance against lawful authority" is sufficiently ambiguous that a jury should decide whether these elements were present in this case. *See e.g., Merrimack Mut. Fire Ins. Co. v. McDill*, 674 So.2d 4, 9 (Miss. 1996) (since the term "household" was capable of multiple interpretations, it was up to the jury to determine whether plaintiff was member of insured's household).

¶22. I would find the grant of summary judgment in this case to be premature. Therefore, I dissent.

**SULLIVAN, P.J., JOINS THIS OPINION.**