Amos S. Basel, J.
On November 14, 1967, Dean Busk, Secretary of State of the United States, was scheduled to speak at the Hilton Hotel, 54th Street and Avenue of the Americas in New York City. The court takes judicial notice that demonstrations against the war in Vietnam were conducted in his honor across the street from the hotel by pacifists and other anti-Vietnam war groups. At about 7:15 p.m. a few blocks south of the hotel and the main demonstration, defendant stood on the sidewalk on the northwest corner of 50th Street and Avenue of the Americas, a bull horn in his hand. Barricades had been placed along the curb. Just prior to traffic moving north on the avenue, defendant walked out into the street, directed the bull horn at the crowd in front of Badio City Music Hall and said, “ Come on out now.” A group of about 100 persons rushed into the middle of the street.
The police on duty at the intersection were shoved aside. The traffic could not get through, could not move; the operators of the vehicles were blowing horns, shouting at the crowd to step aside. Pedestrians stood back, made no attempt to cross. There were approximately over 1,000 people on the corner; it was very noisy. The 100 remained in the center of the roadway until police, arms outstretched, moved into the crowd and pushed them back. Vehicular traffic began to move. Moments later, defendant walked into the street and shouted through the bull horn, “ Come out again.” The scene was repeated and also a third time when defendant again used the bull horn to exhort the crowd to ‘1 Come on out. ’ ’ After the third episode, defendant, an 18-year-old college student, was arrested and charged with violating section 240.08 of the Penal Law — Inciting to riot.
Upon termination of the preliminary hearing, defendant moved to dismiss the information on the grounds (1) the statute was unconstitutional and (2) he did not incite to riot.
Section 240.08, Inciting to riot, is new to the Penal Law and no cases have as yet been reported under it. It was, however, a common-law crime. (Commonwealth v. Egan, 113 Pa. Super. Ct. 375; Commonwealth v. Hayes, 205 Pa. Super. Ct. 338; State *251 v. Cole, 249 N. C. 733, cert, den., 361 U. S. 867; Kasper v. State, 206 Tenn. 434, cert, den., 361 U. S. 930.) In Commonwealth v. Egan (supra) the Pennsylvania court upheld the conviction of defendant on the charge of inciting to riot although there was no such crime under Pennsylvania statutory law. In North Carolina and Tennessee, convictions were similarly upheld based upon principles of common law.
The New York statute reads: “ A person is guilty of inciting to riot when he urges ten or more persons to engage in tumultuous and violent conduct of a kind likely to create public alarm.” This follows the general principles of the common-law crime defined in Corpus Juris Secundum (vol. 77, Riot, § 2, p. 424), “ Language used must be such that in the light of all the circumstances they tend to a breach of the peace or is likely to provoke or incite a riot.” The new statute is more specific and well defined than the former standard and “ sufficiently definite, clear and positive to give unequivocal warning to citizens of the rule which is to be obeyed.” (People v. Byron, 17 N Y 2d 64, 66.) •
The crimes of “ riot ” and “ unlawful assembly ” were defined by the prior Penal Law. The law covered conduct in the area of offenses against public order in sections 2090, 2092 and 2094 of the Penal Law (old). The defendant is therefore on notice of the new crime. (Winters v. New York, 333 U. S. 507, 515, Musser v. Utah, 333 U. S. 95, 97. See, also, People v. Epton, 19 N Y 2d 496 [1967].) Certainly “ a reasonable man subject to the statute would be informed of the nature of the offense prohibited and what is required of him.” (People v. Byron, supra, p. 67.)
The statute does not contravene or impede First Amendment rights. Although the right of free speech, sets us apart from totalitarian regimes (De Jonge v. Oregon, 299 U. S. 353, 365) it does have limitations and ‘ ‘ is not absolute at all times and under all circumstances.” Chaplinsky v. New Hampshire, 315 U. S. 568, 571; Schenck v. United States, 249 U. S. 47; Near v. Minnesota, 283 U. S. 697; Dermis v. United States, 341 U. S. 494; Adderley v. Florida, 385 U. S. 39; People v. Street, 20 N Y 2d 231.)
As the court said in Cantwell v. Connecticut (310 U. S. 296, 308): “ No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot * * * When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious.” *252 The statute is not unconstitutional for vagueness. It clearly defines the number of people, 10, who must be urged to action. It describes the type of conduct it condemns broadly but carefully as “ tumultuous and violent”, but that description is based on the common-law crime which has been well and carefully defined in many cases. The Legislature has not “ established standards so vague, indefinite, imprecise and subjective ” (People v. Radich, 53 Misc 2d 716, 725) that the statute be held unconstitutional.
The statute is therefore clearly constitutional.
There remains the crucial question — have the People proven at this preliminary hearing that a crime has been committed and that defendant is connected with that crime?
Defendant’s exhortation to “ Come out now ”, appears to have been a prearranged code answered in each instance by about 100 people. In conjunction with the anti-Busk demonstration four blocks to the north, the barricades along the curb, the bull horn in defendant’s possession, this activity must be taken as an attempt to aid the demonstration by disrupting traffic and promoting general chaos, confusion and disorder. At 7:15 p.m. on Sixth Avenue, tempers flare easily, especially when they are aroused for no apparent cause. Defendant’s actions standing alone, without adequate explanation from him, most certainly were likely to arouse “ public alarm.” He created a potentially explosive situation. He was “ urging 100 or more persons to engage in tumultuous and violent conduct.” His language was mild, but it was a call to action and the activity he urged and induced was certainly ‘ ‘ tumultuous and violent ’ ’ within the statutory description.
If the police had not brought the group under control quickly, it can readily be predicted that riot and damage to persons and property would have ensued. One thousand people were present. Defendant, an 18-year-old college student, could readily understand that his actions in that context could most likely cause a clear and present danger of “ public alarm.” It was a potentially violent circumstance he willfully and forcefully created.
We here face one aspect of calculated resistance to legal authority. This appears to be a coil in the wave of civil disorders, resistance to civil authority, rolling over the country. In an effort to confer respectability upon these activities they have been misnamed civil disobedience.
The late Martin Luther King, Jr., defined civil disobedience when he said, “ In no sense do I advocate evading or defying the law. That would lead to anarchy. One who breaks an unjust law must do so openly, lovingly and with a willingness to accept *253 the penalty. This is in reality expressing the highest respect for law.”
Rebellion against specific laws proclaimed to be unjust is the essence and meaning of civil disobedience, i. e., defiance of laws barring Negroes from eating at the counters of public restaurants.
But what is unjust about a traffic regulation which allows cars to proceed in orderly fashion, that defendant should oppose it? Disapproval of Government action re Vietnam has been used by a minority to justify disobedience to all law. They did sit down in the middle of 42nd Street, released pigeons in Grand Central Station at rush hour, invaded the offices of Dow Chemical Company, attempted to block draftees from answering their Government’s call to duty. This scorn for authority is resorted to in the name of justice and morality in complete disregard of the rights of others, and usually with no relationship to the matter protested against.
In our society where legal and legitimate means of protest are readily and abundantly available, why are the bull horns and the sit-downs, and the interference with traffic and with guiltless bystanders preferred? It would appear these spectacular activities are disruptive of legal authority and gather widespread publicity calculated to cause public consternation, uneasiness and alarm. Behind the alleged high moral purpose lies a psychic assault upon the average man. He must be made to believe his world is tumultuous and violent and urgently needs altering in accordance with the actor’s notions. “We will march, we will howl, we will disrupt to gain our ends,” these protestors shout in essence. To further this activity and that result, wittingly or not, defendant bestowed his effort.
What has the call to 100 people to disrupt traffic on Sixth Avenue to do with the Vietnam war? Is not the real purpose of this ‘‘ tumultuous and violent ’ ’ conduct to cause public disturbance and alarm in the hope this will incite a riot and thus aid to accomplish the actor’s vision of his cause?
On this record I doubt the defendant could be proven guilty beyond a reasonable doubt; but we are not concerned with that problem now. The People at the preliminary hearing have proven, in my opinion, that the crime of inciting to riot as defined in our statute was committed, and that the defendant is connected with it.
The motion to dismiss is denied. Defendant is held for trial.