STATE OF NORTH CAROLINA v. JAMES COLE, JAMES GARLAND MARTIN AND OTHERS TO THE STATE UNKNOWN.

(Filed 25 March, 1959.)

**1. Riot § 1—**

The crimes of inciting a riot and participating in a riot are separate and distinct offenses against the public peace.

**2. Same—**

Defendants may not be convicted of inciting to riot unless the incitement results in a riot, and therefore in a prosecution for inciting a riot the State must show, in addition to incitement by defendants, that an unlawful assembly took place and that it was accompanied by actual force or violence, or that it had at least an apparent tendency thereto.

**3. Riot § 2— Indictment held sufficient to charge defendants with inciting to riot.**

An indictment charging that defendants, with others unknown armed with certain weapons, did assemble near a certain town for the purpose

of conducting a meeting and rally of the so-called Knights of the Ku Klux Klan, with the common intent to preach racial dissention and to coerce and intimidate the populace, after they had been warned that said meeting would cause violence and a breach of the peace, and that they wilfully and unlawfully did incite a riot, *held* sufficiently to allege that the assembly which defendants encouraged was for an unlawful purpose which would naturally lead to a riot, and therefore was sufficient to charge inciting to riot, without allegation that defendants attempted to mutually assist each other against lawful authority or engaged in any act of personal violence.

**4. Unlawful Assembly—**

An assembly for a lawful purpose may be converted into an unlawful assembly if at any time during the meeting the persons assembled act with a common intent, formed before or during the meeting, to obtain a purpose which will interfere with the rights of others by committing disorderly acts in such manner as to cause sane, firm and courageous persons in the neighborhood to apprehend a breach of the peace.

**5. Riot § 2—**

The evidence in this case *is held* sufficient to be submitted to the jury that defendants, armed with deadly weapons, encouraged and attended a meeting of the Ku Klux Klan in a neighborhood having a large number of Indian residents after inflammatory speeches, cross-burnings and newspaper reports thereof had incensed the Indians of the community to such an extent that the proposed meeting would tend to invoke a breach of the peace and incite to riot, and motion for involuntary nonsuit was properly denied as to both defendants.

**6. Constitutional Law § 18—**

The right of free assemblage and the right to bear arms does not sanction an assembly by a secret society for the unlawful purpose of intimidating or coercing the populace or any segment thereof and thus usurp the functions of the law enforcement officers of the community or the courts of the State.

**7. Criminal Law § 37: Riot § 2—**

In a prosecution of two defendants for inciting to riot, evidence of inflammatory statements made by one of them, which were not made in the presence of the other, is inadmissible as to such other, and the admission of such evidence over the objection of such other is prejudicial as to him.

**8. Riot § 2—**

In a prosecution for inciting to riot, the court is required to charge the elements of riot, since, unless the jury can find from the evidence that a riot occurred, defendants could not be guilty of inciting to riot.

**9. Same—**

In this prosecution for inciting to riot, the court correctly charged that the assemblage encouraged and attended by defendants must have been unlawful, calculated to result in a breach of the peace, and that

STATE *v.* COLE.

a riot must have ensued, in order to convict defendants of inciting to riot.

**10.  Riot § 1—**
    An unlawful assembly is an essential element of the offense of riot.

APPEAL by defendants from *Williams, J.,* March Term 1958 of ROBESON. These cases as Nos. 722 and 724 were argued at the Fall Term 1958 of this Court.

This is a criminal action. The defendants were indicted jointly and tried together in the court below. Separate appeals were brought to this Court, but they will be considered together and disposed of herein.

The defendants were tried upon a bill of indictment charging that James Cole and James Garland Martin, together with other persons to the State unknown, of a total number of more than ten, did on 18 January 1958, wilfully and unlawfully, while armed with firearms, concealed and unconcealed, to wit, pistols, rifles, and shotguns, assemble near the Town of Maxton in the County of Robeson, for the common purpose of conducting a meeting and rally of the so-called Knights of the Ku Klux Klan, with the common intent to preach racial dissention and coerce and intimidate the populace, and with the common intent to carry out said purpose in a violent manner to the terror of the people, with the common intent mutually to assist one another against all who should oppose them, although they had been warned that their prior conduct and pronouncements against the Indians of Robeson County had incensed and inflamed said Indians against them, and that a large number of said Indians intended to appear in armed force at said meeting, and that to hold said meeting would cause violence and a breach of the peace; that the said James Cole, James Garland Martin, and others to the State unknown, wilfully and unlawfully did incite a riot.

The State's evidence tends to show that the defendant James Cole of Marion, South Carolina, is the Grand Wizard of the Ku Klux Klan in North Carolina, and that headquarters of the Klan is in Charlotte, North Carolina; that James Garland Martin of Reidsville, North Carolina is known as the Titan of the Klan, and receives and examines applications for membership in the Klan, and places orders for Klan robes. There is evidence tending to show that Martin received a letter from the Charlotte headquarters prior to the Maxton rally, directing him to be armed at all Klan rallies in the future, and that he was invited to the Maxton rally by James Cole.

The State's evidence further tends to show that the meeting held or

attempted to be held on 18 January 1958 was the seventh or eighth meeting of the Klan in Robeson County. There is also evidence to the effect that James Cole had leased the field from the owners or occupants thereof where the Maxton rally was attempted to be held.

Paul Mason, a reporter for National Broadcasting, Radio Program Monitor, testified that he secured an interview with the defendant Cole on or about 21 December 1957 at a Klan meeting in Greensboro, North Carolina; that at that meeting Cole identified himself as the Grand Wizard of the Klan; that they were within a small circle of people and that all had guns. "I asked him why they had guns * * *. He said, 'We have a right to carry arms under the Constitution.' I said, 'You won't tell me any more why you are carrying guns?' He said, 'I think they speak for themselves.' Before I could say anything, he said, 'If they don't, they will.' * * * He said, 'I got five guns and I got money in the bank to buy five more, and as long as the Constitution gives me the right to bear arms, there ain't going to be no Negroes in school with my children. * * * I will tell you this: In North Carolina if the Pearsall Plan is not enough, then the Smith & Wesson Plan is.' I don't believe Cole was armed. Almost everyone else in the crowd was."

Bruce Roberts, the owner of the Scottish Chief and Lumberton Post, weekly newspapers, testified that on Friday or Saturday of the week before the Klan meeting on 18 January 1958, a man came to his office by the name of Guy—a white man; that as a result of the conversation with Guy "I went to a house on Fifth Street in Lumberton about 6:30 at night on Monday, the 13th of January 1958. I met James Cole at this time. James Cole and the person I know by the name of Guy said they had a couple of crosses to burn. * * * Apparently, they wanted me to write a story about it, a news story in my paper. * * * We left the house by car. James Cole and Howard Taylor were the other persons in the car in which I was riding. Howard Taylor is an employee of mine, who works with my paper in Maxton. * * * On the instructions of James Cole, we followed several cars to St. Pauls * * * we stopped in a sort of parking lot area. * * * There were several other cars. Some Klansmen in robes were there and some other cars began pulling in with Klansmen in them * * *. The defendant Cole said they were going to burn a cross in front of an Indian house near St. Pauls. Cole put on a Klan uniform and everybody had on or put on Klan robes. There were about fifteen hooded Klansmen there. The Klansmen got in cars and drove from there * * * for a mile or two, got out and burned a cross in front of a home. * * * James Cole was in uniform or regalia of the Ku Klux Klan. It was

STATE *v.* COLE.

different from the others, sort of purple * * * with two crosses on the front. * * * Cole said, regarding the cross-burning at St. Pauls, that an Indian woman lived in this house and she was having an affair with a white man; that this cross was burned as a warning to her. The cross was burned directly in front of the house * * * about 150 feet from the house. * * * James Cole and the Klansmen stayed at the house at St. Pauls where the cross was burned five or ten minutes. The Klansmen then got in cars and drove down 301 to East Lumberton. I followed along. James Cole and Howard Taylor were in my car. Over near the old mill in East Lumberton the car stopped at a vacant lot. James Cole was giving instructions. * * * They had another cross similar to the one they had near St. Pauls, six or seven feet high, and proceeded to set it up in the vacant lot. Cole said they were burning this particular cross in East Lumberton because the Klan had been informed that an Indian family had moved into East Lumberton; that the Klan had three investigators working on it, and that the burning of the cross was a warning."

This witness testified that he carried no story of this cross-burning in his paper but did make a report to the Fayetteville Observer and to the Charlotte News on Tuesday morning prior to the rally on the 18th; that he was a correspondent for those papers.

Malcolm G. McLeod testified that he was the Sheriff of Robeson County; that he knew the defendants James Cole and James Garland Martin; that on 15 January 1958 the witness had gone to Pembroke in Robeson County in response to a call from the Mayor of Pembroke. At the City Hall he found approximately thirty Indians assembled there. After talking with them, the witness, together with Captain C. R. Williams and Sergeant G. D. Dodson of the Highway Patrol, went to Marion, South Carolina, and had a talk with Cole at his residence. "I told Mr. Cole how the tension was growing in Robeson County among the Indian people with reference to the Ku Klux Klan having a rally in Maxton as advertised in the paper for the following Saturday night, January 18th * * * I told Mr. Cole that I had seen in the newspapers Tuesday afternoon and Wednesday morning about two cross-burnings as a warning to the Indian people of Robeson County."

According to this evidence and other evidence on behalf of the State, Cole was advised and urged not to hold the Klan rally at Maxton as advertised; he was told that it would be extremely dangerous to go ahead with the plans for the rally. Sheriff McLeod testified that he told Cole that he "thought his life would be in danger if he made the same speech he had been making."

21 — 249

STATE *v.* COLE.

Sheriff McLeod, continuing, testified that Cole did not give a definite answer as to whether he would have the meeting and rally on Saturday night; he said, "he would let us know."

Sergeant Dodson, who was present at the conference in Marion, South Carolina, testified that Cole said "he wasn't afraid; that he could call it off if he wanted to; never did say whether or not he would."

According to the State's evidence, Cole never communicated further with the officers about the meeting, but did call Bruce Roberts and inquired of him on Wednesday or Thursday before the rally on Saturday whether the Indians were mad at him and the Klan. Roberts inquired of Cole whether he was going to hold the rally, and he answered, "Yes, the Klan never backed down."

The witness McLeod further testified that he had seen Cole at other Klan meetings, "I believe that was the seventh or eighth since the opening meeting of the Klan held in Robeson County. I saw Cole in Shannon in October of 1956, one (meeting) up on 301 North of St. Pauls at Peter Frank Everett's place; saw him at Ivey's Crossroads, and one held in Wishart Township, near Allenton. The other Klan meetings I didn't go to."

This witness also testified that Cole would open the meetings with a hymn and prayer, and would then start his talk. "Practically every time he would say: 'Damn the Negro, damn the Jews * * * and the Catholics.' He would also give reference to the Pearsall Plan, said 'if the Pearsall Plan doesn't work the Smith & Wesson Plan will work.' "

This witness further testified that he had never seen the defendant Martin until the night of the rally on 18 January 1958; that he arrived at the place of the meeting between 8:00 and 8:30 with one of his deputies, Ralph Purcell; that as soon as Mr. Purcell and he stepped out of the car and started towards the field, eight or ten men with shotguns, rifles and pistols surrounded them. They identified themselves and told them they wanted to see James Cole. They were accompanied by the armed group to where the defendant Cole was working on a generator that made power for the electric lights. When they arrived there were about 200 people on the field. "I would say there were 25 or 30 members of the Ku Klux Klan there. Everybody had one or two guns—rifles—shotguns. One man had two pistols strapped to his side. * * * I didn't see any colored people, saw some white people and some Indians. * * * James Garland Martin came up to where Mr. Cole and I were standing and was talking about Mr. Cole's wife being in the car. * * * Mr. Cole said to take his wife and

children out of the car and told James Garland Martin to put them in a car out at the road. * * * I spoke to him (Cole) and I said, 'Jimmie, I told you how these people feel about this thing up here.' He said, 'Yes.' He said he wanted to talk to me in private. He said, 'I didn't want to come, but the rest wanted to come and I had to come with them, and that is the reason I am here.' * * * He then said, 'I am due some protection for a lawful assembly.' I said, 'I don't think you can call it a lawful assembly, you with men armed with guns and rifles * * *.' I told him, 'I believe if I had one hundred and fifty men, I couldn't keep the Indians of Robeson County from coming in on that field.' "

The evidence tends to show that Cole was not armed at the time he had his conversation with Sheriff McLeod, nor is there any evidence that he was ever armed. Later, members of the Indian race began arriving and lined up across the road from the field, many of them being armed.

The Sheriff left the scene, returned to his car and called by radio for additional deputies and for members of the Highway Patrol. Nine deputies and about fifteen members of the Highway Patrol responded to the call. Before the Sheriff and the additional officers returned to the scene of the rally the shooting had broken out. Several hundred shots were fired, and two people, a news reporter and a soldier by-stander, were slightly injured by gunshot. The crowd was estimated to consist of from a few hundred to a thousand people. The shots fired were estimated to be anywhere from one hundred to several hundred. When the Highway Patrol and the additional police officers arrived, it took about thirty minutes to restore order; firearms in large numbers were taken from the Klansmen and from the Indians. It was about 10:30 p.m. before the field was cleared of people and automobiles. A number of cars had been damaged, the tires of one car had been slashed, and several cars had to be towed away by a wrecker.

The defendant Martin was disarmed during the riot and arrested for carrying a concealed weapon and for being drunk. He was convicted of both charges.

Sheriff McLeod had a conversation with the defendant Martin sometime during the week after the rally near Maxton, and Martin told the Sheriff he had attended the Klan rally in Randleman a week or two before the Maxton rally; that Cole was there and made a speech; that Cole said in Randleman "there were about 30,000 half-breeds down in Robeson County, and that he was going to have a

rally there and scare them up." This evidence was admitted only as against Martin.

Ralph Purcell, the Deputy Sheriff of Robeson County who accompanied the Sheriff to see Cole at the rally, testified that the community where the rally was held is made up of "colored, white, and Indian"; that ten Indian families lived in a radius of a mile of the place. This witness further testified that when Sheriff McLeod told Cole that he thought it inadvisable to hold the meeting, Cole told him he "couldn't see any reason why he should not hold it, but would tone it down some."

The jury returned a verdict of guilty as to both defendants as charged in the bill of indictment. From the sentences imposed, both defendants appeal, assigning error.

*Attorney General Seawell, Assistant Attorney General Love, Bernard A. Harrell, Staff Attorney, for the State.*

*Charles B. Nye, Daniel M. Williams, Jr., attorneys for defendant Cole.*

*E. L. Alston, Jr., attorney for defendant Martin.*

Denny, J.  We shall first consider certain assignments of error based on exceptions which both defendants have preserved and argued in their respective briefs.

The defendants insist that the trial court committed error in refusing to sustain their respective motions to quash the bill of indictment. They contend that while the indictment attempts to charge the defendants and their companions or associates with unlawful assembly, the indictment does not set forth any unlawful purpose or any unlawful acts which the defendants assembled to commit; that it does not charge the defendants with the necessary elements of an attempt to mutually assist each other against lawful authority. The arguments in the briefs are substantially as if the defendants were charged with engaging in a riot, when, as a matter of fact, the bill of indictment charges the defendants, and others to the State unknown, with inciting a riot.

The crimes of inciting a riot and participating in a riot are separate and distinct offenses against the public peace. Both crimes have their origin in the common law.

"Inciting to riot is not a constituent element of riot; they are separate and distinct offenses. * * * On may incite a riot and not be present or participate in it, or one may be present at a riot, and by giving support to riotous acts be guilty of riot, yet not be guilty of

inciting to riot." *Commonwealth v. Safis,* 122 Pa. Super. 333, 186. A. 177; 77 C.J.S., Riot, section 1(b), page 423.

In the case of *Commonwealth v. Egan,* 113 Pa. Super. 375, 173 A. 764, it was held that inciting to riot is a common law offense, the gist of which is its tendency to provoke a breach of the peace, though the parties first assembled for an innocent purpose. The Court said: "Giving the word 'incite' its plain and accepted meaning—to arouse, stir up, urge, provoke, encourage, spur on, goad—there can be no doubt of the offense charged * * *. Inciting to riot from the very sense of the language used, means such a course of conduct, by the use of words, signs or language, or any other means by which one can be urged on to action, as would naturally lead, or urge other men to engage in or enter upon conduct which, if completed, would make a riot. If any men or set of men should combine and arrange to so agitate the community to such a pitch, that the natural, and to be expected results of such agitation, would be a riot, that, would be inciting to riot, an offense at common law * * *." *Commonwealth v. Sciullo,* 169 Pa. Super. 318, 82 A. 2d 695.

In the instant case, the bill of indictment does charge that the defendants, while armed with certain weapons, did assemble near the Town of Maxton for the common purpose of conducting a meeting and rally of the so-called Knights of the Ku Klux Klan, with the common intent to preach racial dissension and to coerce and intimidate the populace. We hold that the indictment adequately charges an unlawful purpose and that the case of *S. v. Baldwin,* 18 N.C. 195, relied on by the defendants, is distinguishable and not controlling on the charge contained in the bill of indictment in this case.

The defendants were not convicted of unlawful assembly or riot, but of inciting to riot. Naturally, they could not have been convicted of inciting to riot unless the incitement resulted in a riot. "It must be shown in riot that the assembling was accompanied with some such circumstances, either of actual force or violence, or at least having an apparent tendency thereto, as were calculated to inspire people with terror, such as being armed, making threatening speeches, turbulent gestures, or the like, or being in disguise * * *. In any case, it is well settled that it is not necessary that personal violence be committed * * *." Wharton's Criminal Law and Procedure (1957 Ed.), Vol. 2, section 864, page 731; *S. v. Lustig,* 13 N.J. Super. 149, 80 A. 2d 309. This assignment of error is overruled.

The defendants assign as error the failure of the trial court to sustain their motions for judgment as of nonsuit at the close of the

State's evidence, which motions were renewed after the defendants announced they would offer no evidence.

The overwhelming weight of authority seems to be to the effect, in the absence of a statute to the contrary, that persons may assemble together for a lawful purpose, but if at any time during the meeting they act with a common intent, formed before or during the meeting, to attain a purpose which will interfere with the rights of others by committing disorderly acts in such manner as to cause sane, firm and courageous persons in the neighborhood to apprehend a breach of the peace, such meeting constitutes an unlawful assembly. See Anno: Unlawful Assembly, 58 A.L.R. 751, and 93 A.L.R. 737, where the authorities in support of this view, from many jurisdictions, are assembled.

In the case of *People v. Burman, et al*, 154 Mich. 150, 117 N.W. 589, 25 L.R.A. (NS) 251, the defendants were convicted of a breach of the peace in violation of a city ordinance. The defendants had marched through the streets of the City of Hancock, Michigan, displaying red flags. They had been warned that the display of such flags would cause a breach of the peace and riots. The Court, in upholding the convictions, said: "The question here is not whether the defendants have in general a right to parade with a red flag. It is this: Had they such right, when they knew that the natural and inevitable consequence was to create riot and disorder? Defendants knew this red flag was hated by those to whom it was displayed, because it was believed to represent sentiments detestable to every lover of our form of government. They knew that it would excite fears and apprehension, and that by displaying it they would provoke violence and disorder. Their right to display a red flag was subordinate to the right of the public. They had no right to display it when the natural and inevitable consequence was to destroy the public peace and tranquillity. It is idle to say that the public peace and tranquillity was disturbed by the noise and violence, not of the defendants, but of those whose sentiments they offended. When defendants deliberately and knowingly offended that sentiment, they were responsible for the consequences which followed, and which they knew would follow. It is also idle to say that these others were wrongdoers in manifesting in the manner they did their resentment at defendants' conduct. This merely proves that they and defendants were joint wrongdoers; that they, as well as defendants, violated the ordinance in question. The object of this proceeding is not to redress the grievance of these other wrongdoers, but it is to redress the grievance of the public whose rights they and defendants jointly invaded. The guilt of their associate wrong-

doers does not lessen defendants' responsibility. It is sufficient to say that defendants by their conduct did 'aid, countenance, and assist in making a riot, noise, and disturbance, and therefore violated ordinance No. 10 of the City of Hancock.' "

In the case before us, the evidence supports the view that the so-called Knights of the Ku Klux Klan, under the leadership, control and direction of the defendant Cole, did by inflammatory speeches and cross-burnings, and reports thereof published in the newspapers, incense the Indians of Robeson County to such an extent that the proposed rally at Maxton would tend to provoke a breach of the peace and incite to riot. In fact, Cole was so advised before and after the rally was underway. Moreover, Cole and Martin knew that the purpose of the rally was to incense, intimidate, and scare the Indians. There is evidence to the effect that when Sheriff McLeod arrived at the scene of the planned rally on Saturday night, 18 January 1958, he advised Cole not to try to hold the rally; that Cole said "he couldn't see any reason why he should not hold it, but would tone it down some." This we think is tantamount to an admission by Cole that he originally intended to make statements that would be resented by the Indians and likely to cause them to riot. Otherwise, why "tone it down"? As to Martin, according to the evidence admitted against him, Cole had told him about a week or two before the Maxton rally that there were about 30,000 half-breeds in Robeson County and he was going to have a meeting and try to "scare them up." Therefore, it is evident that Martin knew the purpose of this particular meeting.

In light of the evidence disclosed on the record on this appeal, there can be no justification for the defendants and their associates to go to the rally at Maxton on 18 January 1958, armed with rifles, shotguns, pistols and other weapons, some concealed and others unconcealed, if their intent and purposes were legitimate and peaceful. Such show of armed defiance was incompatible with peaceful and lawful purposes. Moreover, such conduct within itself would be calculated to cause a breach of the peace in any community, particularly in a county where the defendant Cole had been preaching racial dissension and hatred and conducting cross-burnings for the purpose of frightening certain Indian families in the community. If any of the Indian residents of Robeson County are violating the law in any respect, it is the duty and responsibility of the duly constituted law enforcement officers of that county to prefer proper charges against them and to see that they are dealt with according to law (and this

we are confident they will do), but there is nothing in our Constitution or laws that authorizes the Ku Klux Klan or its officers to substitute themselves for the law enforcement officers of a community or the courts of the State.

In our opinion, when all the evidence adduced in the trial below is considered in the light most favorable to the State, as it must be on a motion for judgment as of nonsuit, it is sufficient to carry the case to the jury as to both defendants, and we so hold. *S. v. Block,* 245 N.C. 661, 97 S.E. 2d 243; *S. v. Burgess,* 245 N.C. 304, 96 S.E. 2d 54; *S. v. Kluckhohn,* 243 N.C. 306, 90 S.E. 2d 768.

The defendant Martin assigns as error the admission, over objection, and exceptions duly entered, of certain evidence against him with respect to the conversations between the defendant Cole at his residence in Marion, South Carolina, Sheriff McLeod of Robeson County, and certain members of the State Highway Patrol, although Martin was not present at the time. This defendant likewise assigns as error the evidence admitted against him of certain statements made by Cole, not in the presence of the defendant Martin, as to why he had the cross-burnings at St. Pauls and East Lumberton the latter part of the week before the Maxton rally. We think the evidence as to the contents of the conversations in Marion, South Carolina and as to why the crosses were being burned in Robeson County was inadmissible as to Martin and should have been excluded as to him, and the failure to do so entitles him to a new trial. *S. v. Franklin,* 248 N.C. 695, 104 S.E. 2d 837; *S. v. Kluttz,* 206 N.C. 726, 175 S.E. 81; *S. v. Simmons,* 198 N.C. 599, 152 S.E. 774; *S. v. Green,* 193 N.C. 302, 136 S.E. 729.

The defendant Cole's assignments of error Nos. 10 through 18 are based on his exceptions to the court's charge. Assignment of error No. 10 is directed to the court's definition as to what constitutes a riot. The court pointed out that there is no statutory definition of riot in this State, but that it has been defined by our Supreme Court to be, "a tumultuous disturbance of the peace by three persons or more assembled together of their own authority, with intent mutually to assist one another against all who shall oppose them, and afterwards putting the design into execution, in terrific and violent manner, whether the object in question be lawful or otherwise. Indictment for riot always must charge the defendants with unlawful assembly, mutual intent to assist one another, and execution of the intent by overt acts, before they can be convicted." This definition was taken almost verbatim from the opinion of this Court in the case of *S. v. Stalcup, et al,* 23 N.C. 30, and approved in *S. v. Hoffman,* 199 N.C. 328, 154 S.E. 314.

It was not only proper but incumbent upon the court to define the crime of riot. It was not the crime for which this defendant was tried, but the crime which he was charged with inciting. Unless the jury could find from the evidence that a riot occurred, it would not have been justified in finding this defendant guilty of inciting a riot. This assignment of error is without merit.

The defendant Cole's exception No. 45, argued under assignment of error No. 12, is to the instruction given by the court with respect to the right to bear arms. The pertinent part of the instruction was as follows: " * * * the Constitution and laws of this State guarantee to a person the right to bear arms and right to assemble peaceably for the purpose of registering their grievances. I instruct you that does not give any individual, or any body of individuals, the right to bear arms for unlawful purposes in any respect anywhere."

This Court said in the case of *S. v. Huntley,* 25 N.C. 418: "The bill of rights in this State secures to every man, indeed, the right to 'bear arms for the defense of the State.' While it secures to him a *right* of which he cannot be deprived, it holds forth the *duty* in execution of which that right is to be exercised. If he employs those arms, which he ought to wield for the safety and protection of his country, to the annoyance and terror and danger of its citizens, he deserves but the severer condemnation for the abuse of the high privilege with which he has been invested. * * * A gun is an 'unusual weapon' wherewith to be armed and clad. No man amongst us carries it about with him, as one of his everyday accoutrements—as a part of his dress—and never, we trust, will the day come when any deadly weapon will be worn or wielded in our peace-loving and law-abiding State as an appendage of manly equipment * * *. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people." This exception is without merit.

Exceptions Nos. 46 and 47, argued under this same assignment of error, are to the following portions of the court's charge: "If you find from the evidence beyond a reasonable doubt that on this occasion they went to this place for an unlawful purpose, armed with deadly weapons, pistols, rifles, guns, blackjacks, for the purpose of conducting a meeting, despite any opposition that might develop, and putting down by force any resistance to such meeting and to mutually assist each other in such conduct, that would constitute unlawful assembly; and if they took steps to carry it into execution in a violent manner, would constitute a riot. * * * (Exception No. 46)

"It makes no difference whether the original purpose of assembly

be lawful or unlawful. If it be for a lawful purpose and after having so assembled they change their plan or mind about it and adopt an unlawful purpose of assembly, that which has been a lawful assembly is converted into unlawful assembly, and if that be done by mutual consent in carrying out the design or putting the design into execution, with mutual intent to assist each other against any opposition, and violence and tumult result, that would constitute unlawful assembly, and if you so find beyond a reasonable doubt you will satisfy the law with respect to that element of the offense alleged." (Exception No. 47)

We do not construe these instructions as prejudicial to the defendant. They do not eliminate the necessity for an unlawful assembly, which must be charged and proven where one is tried on a bill of indictment for participating in a riot. *S. v. Hoffman, supra.*

In *S. v. Stalcup, supra,* an unlawful assembly was charged, but there was no charge that the parties assembled for the purpose of doing a lawful act in an unlawful manner or of doing an unlawful act. However, the authorities hold an unlawful assembly may be created deliberately or by chance. In any event, the unlawful assembly must precede the conduct which constitutes participation in a riot. In considering what constitutes a riot or civil commotion, this Court, in *Spruill v. Insurance Co.,* 46 N.C. 126, said: "A riot is where three or more persons actually do an unlawful act, either with or without a common cause. To this, Chitty, in his note, says, 'The intention with which the parties assemble, or, at least, act, must be unlawful,' and this qualification of Mr. Chitty is recognized by this Court in the case of *S. v. Stalcup,* 23 N.C. 30."

It is said in 77 C.J.S., Riot, section 1, page 422: "Inciting to riot. The gist of this offense is its tending to provoke a breach of the peace, even though the parties may have assembled in the first instance for an innocent purpose, and it is an offense at common law. It means such a course of conduct, by the use of words, signs, or language, or any other means by which one can be urged to action, as would naturally lead or urge other men to engage in, or enter on, conduct which, if completed, would make a riot."

In 46 Am. Jur., Riots and Unlawful Assembly, section 10, page 103, we find the following: "An unlawful assembly is a constituent and necessary part of the offense of riot at common law, and must precede the unlawful act which completes the offense. Very evidently therefore, presence of the essential elements of an unlawful assembly is essential to a conviction for riot, and should be considered in connection with prosecutions for riot. Neither the time nor the place of

the assemblage is material in determining whether or not the as-semblage constitutes a mob * * * although the place of the riot may be material in determining liability as between the county and a municipality. Likewise, the fact that the group of persons do not vol-untarily come together does not prevent their action from being that of a mob; nor is the primary purpose for which they assemble ma-terial, if they in fact form and execute an unlawful purpose after they are brought together." These exceptions are overruled.

We have carefully reviewed the remaining exceptions and assign-ments of error and, in our opinion, no error has been made to appear that would justify disturbing the verdict below as to the defendant Cole.

As to the defendant Cole—No Error.

As to the defendant Martin—New Trial.