STATE OF NORTH CAROLINA v. HOWARD BROOKS

No. 76

(Filed 6 June 1975)

1. Riot and Inciting to Riot § 1— elements of the crime of riot

The elements of the crime of riot are public disturbance, assemblage, three or more persons, disorderly and violent conduct or the imminent threat of such conduct, and results in injury or damage to persons or property or creates a clear and present danger or injury or damage to persons or property. G.S. 14-288.2(a).

2. Constitutional Law § 18; Riot and Inciting to Riot § 2— constitutionality of riot statute

G.S. 14-288.2 prohibiting engaging in and inciting a riot is not so complex and imprecise as to be unconstitutional; furthermore, the reach of G.S. 14-288.2 is not so pervasive as to include activity protected by the First Amendment, since the advocacy of imminent lawless

State v. Brooks

action is the only type of speech which can come within the purview of G.S. 14-288.2, and such speech is not protected by the First Amendment.

3. **Riot and Inciting to Riot § 2— insufficiency of warrant to charge crime**
Warrant charging that defendant "did unlawfully, wilfully incite a riot by urging three or more persons to congregate at Prospect School, Robeson County, North Carolina, thereby creating a clear and present danger of a riot" failed to state the commission of any criminal offense, much less the offense of inciting a riot.

4. **Constitutional Law § 30; Criminal Law § 40— district court proceedings — no requirement of transcript**
There are no constitutional infirmities in the denial of a free transcript of the district court proceedings to an indigent defendant since the appeal from district court to superior court is a *de novo* procedure, there is no requirement that a defendant purchase and provide the superior court with a transcript of the district court proceedings in order to secure full appellate review, there is no statutory requirement that a transcript of district court proceedings be maintained, and a transcript of the district court proceedings is not needed for an effective appeal for trial *de novo* in superior court.

5. **Riot and Inciting to Riot § 2— items found at scene of riot — admissibility**
In a prosecution for engaging in and inciting a riot, the trial court did not err in allowing into evidence a piece of iron pipe, a revolver, two shotguns, a machete, and two jugs of amber liquid, all of which were found at the scene of the disorder shortly after defendant was arrested.

6. **Criminal Law § 128— mistrial — motion properly denied**
The trial court did not err in failing to grant defendant's motions for a mistrial and by failing properly to instruct the jury upon certain alleged acts of prosecutorial misconduct.

APPEAL pursuant to G.S. 7A-30(1) to review decision of the Court of Appeals reported in 24 N.C. App. 338, 210 S.E. 2d 535 (1975) (opinion by *Parker, J., Britt* and *Vaughn, J.J.* concurring), which found no error in defendant's convictions for inciting a riot and for engaging in a riot, but ordered a new trial on the charge of failure to comply with a lawful order to disperse.

Defendant was charged by warrants with the above three offenses, violations respectively of G.S. 14-288.2 (d), 14-288.2 (b), and 14-288.5 (b). All three offenses being misdemeanor violations, defendant was first tried before McLean, D.J., at the 14 May 1973 term of Robeson County District Court. Upon being convicted of all charges, defendant exercised his absolute right

to appeal to Superior Court for trial *de novo. See* G.S. 7A-290. Defendant's cases thereafter were tried before Bailey, J. at the 9 July 1973 Session of Robeson County Superior Court.

The State's evidence, summarized except where quoted, tended to show the following:

C. E. "Buddy" McLaurin, a local newsman, testified that on 23 March 1973 at approximately 2:00 p.m. he went to a building called the "Stable" in Pembroke, North Carolina, in order to attend a press conference called by the Tuscarora Indians. When he arrived, there were approximately fifty to sixty people in attendance, most of whom were Indians. The following individuals were seated at tables near the front of the meeting room: Vernon Bellacord, National Head Director of the American Indian Movement; Bill Sargent, Eastern Director of the American Indian Movement; Bob Garvey, an official of the Eastern Division of the American Indian Movement; and defendant, who was known in Robeson County as Chief Brooks of the Tuscarora Tribe. Defendant spoke to the group for approximately five minutes and reminded them of an organizational meeting scheduled for 6:45 p.m. at the Prospect School. Defendant told the group that he had been in contact with Young Allen, Superintendent of the Robeson County Public School System, and that Allen had informed him that the Prospect School property would not be available for the meeting because of on-site construction work. Defendant stated that he had been to the school and had observed some exterior construction work and did not think it constituted a reasonable or a prudent excuse for denying them permission to use the facility. Defendant also stated, as he had done at other meetings, that he wanted the people of Robeson County to know that he was willing to die on the school steps and that if there were any "riot clad armed law enforcement" officers on the school grounds, they would be trespassing on Indian property and he hoped they knew what that meant. Defendant's demeanor while speaking at the Stable was described by McLaurin as "more or less matter of fact." McLaurin also added defendant made no request that anybody bring arms to the Prospect School.

McLaurin further testified that he and Bill Price, another newsman, went to the Prospect School that evening at approximately 7:00 p.m. When they arrived, defendant, in a group of approximately one hundred people, was standing on the grounds of the Prospect United Methodist Church, located di-

rectly across a State paved road from the Prospect School. McLaurin saw some forty law enforcement officers standing on the other side of the road (school grounds).

During the course of the evening, McLaurin heard defendant tell certain members of the crowd on three or four different occasions not to go on the road "until he made his decision." He also heard defendant tell his "security force" to "rid the area of alcoholic beverages or anything else."

McLaurin observed one segment of the crowd harass law enforcement officers on several occasions. One individual, in particular, was shining a flashlight in the eyes of the State Highway Patrolmen and telling them that they would be smiling before the night was over.

At approximately 8:00 p.m. McLaurin saw a .38 caliber pistol and a machete being carried by members of the crowd. He later heard the .38 caliber pistol discharge and also saw one shotgun and heard it discharge. The shotgun was fired from a truck as it drove by the church yard.

McLaurin stated that by 8:00 p.m. the crowd had grown from one hundred to approximately one hundred and fifty and that it was at its largest (two hundred) around 9:00 p.m. He left the area about 11:00 p.m.

The State also offered the testimony of twelve law enforcement officers: four from the State Highway Patrol, seven from the Robeson County Sheriff's Department, and one from the State Bureau of Investigation. With the exception of insignificant facts, all of the officers' testimony was basically the same. Their combined testimony, summarized except where quoted, tended to show the following:

The officers arrived at Prospect School on the evening of 23 March 1973 between 6:15 p.m. and 6:45 p.m. During the course of the evening, their force was composed of approximately eighteen members of the Robeson County Sheriff's Department; approximately thirty-five members of the State Highway Patrol; and approximately eight agents of the State Bureau of Investigation. All the State Troopers and Deputy Sheriffs were clad in full riot gear, i.e., a hard helmet with a face shield, a gas mask, riot stick, and pump shotgun.

Approximately seventy-five to one hundred people had assembled on the church property by 6:30 p.m. The crowd con-

tinued to grow throughout the night, reaching a maximum size of approximately two hundred sometime between 11:00 p.m. and midnight. Defendant was present throughout the evening. From time to time he was seen addressing the crowd from the church steps. Due to the verbal abuses directed towards them, as well as other noises, the officers could not hear what defendant was telling the crowd. However, when he spoke, officers could see members of the crowd "stick their arms up in the air" and could hear them yell out "Red Power." Also, during the speeches, various groups in the crowd would sing such songs as "We Shall Overcome."

As the evening progressed the crowd became increasingly noisy and boisterous. A bonfire was built on the church grounds and there was considerable shouting, cursing, dancing, and singing. The officers observed several members of the crowd drinking alcoholic beverages. From time to time, a group would start across the road and call the officers "white and black m _____ f _____"; "pigs"; "white sons of bitches"; "white-eyed m_____ f_____" and other profane and indecent names. These groups also told the officers that if they ever got across the road, they were going to take the officers' riot sticks and guns and use them to "beat the officers to death." Meanwhile, traffic on the paved State road was heavy and some passing motorists were stopped and dragged from their cars while members of the crowd beat on the hoods, sides, and trunks of their vehicles.

Eventually, members of the crowd started throwing beer and coca-cola bottles at the officers. The profanity and verbal insults became increasingly belligerent and violent in tone. Members of the crowd would form a large group and start to come across the road toward the officers. When this happened, defendant would call them back, telling them not to cross the road until he made his decision and that when he made his decision, they were going across to the school grounds. Defendant also announced to the officers that if any of "his people" were injured, then he would "declare war on Robeson County." Many officers, veterans of previous crowd control situations, testified they had never before been as frightened.

Officers continuously observed members of the crowd armed with knives, sticks, pistols and other weapons. At approximately 8:00 p.m. a shot was fired over by the church steps. Shortly thereafter, a member of the crowd emerged onto the paved road and fired several pistol shots into the air.

Sometime after midnight a bottle was thrown out of the crowd. It struck the pavement and splattered glass on some of the officers. Just then, three shotgun blasts rang out. They were fired in quick succession. The pellets fell on the officers' parked vehicles. When this occurred, sometime around 12:20 a.m., Deputy Sheriff Hubert Stone, upon the advice of other officers, issued a command to disperse. Using a "bullhorn," Deputy Stone told the crowd that it had five minutes in which to leave. This directive was greeted by an increased flurry of bottle throwing. Nevertheless, approximately twenty-five people did obey the command to disperse and left. Others, including defendant, remained. After waiting some five to six minutes, Deputy Stone ordered his officers to cross the road and to arrest those who had refused to comply with his command to disperse. The officers carried out this order and arrested forty-eight men, including defendant, six women, and one boy. Others in the crowd evaded arrest by fleeing into the darkness.

A subsequent search of the area on the church side of the road led to the discovery of the following items: (1) a .22 caliber pistol; (2) a beer bottle containing amber liquid with paper stuck in its mouth; (3) a cider jug containing amber fluid; (4) a two-section iron pipe; (5) a single barrel shotgun; (6) a sawed-off shotgun; and (7) a machete.

Defendant did not offer any evidence. He was thereafter found guilty on all charges and from judgments imposing concurrent jail sentences he appealed.

*Attorney General Rufus L. Edmisten by Associate Attorney Thomas L. Ringer, Jr. for the State.*

*Paul, Keenan, Rowan & Galloway by James V. Rowan for defendant appellant.*

COPELAND, Justice.

Defendant brings forward four questions based on five of the fourteen assignments of error properly noted in the record.

In Question #1 (Assignments #1 and #3) defendant contends that the trial court erred in failing to quash the warrants charging him with inciting a riot and engaging in a riot on the grounds that the statutes underlying these charges are unconstitutional on their face and as applied.

We begin our evaluation of defendant's argument by examining the common law offense of riot. In *State v. Cole,* 249 N.C. 733, 107 S.E. 2d 732, *cert. denied,* 361 U.S. 867 (1959), this Court, in an opinion by Justice Denny (later Chief Justice), defined this common law offense as follows:

"[A] tumultuous disturbance of the peace by three persons or more assembled together of their own authority, with intent mutually to assist one another against all who shall oppose them, and afterwards putting the design into execution, in terrific and violent manner, whether the object in question be lawful or otherwise. Indictment for riot always must charge the defendants with unlawful assembly, mutual intent to assist one another, and execution of the intent by overt acts, before they can be convicted." *Id.* at 744, 107 S.E. 2d at 741. *See also State v. Hoffman,* 199 N.C. 328, 154 S.E. 314 (1930) ; *State v. Stalcup,* 23 N.C. 30 (1840).

The common law crime of unlawful assembly, which is a component element of common law riot, contains the following elements: (1) the participation of three or more persons; (2) a common intent to attain a purpose which will interfere with the rights of others by committing disorderly acts; and (3) a purpose to commit acts in such manner as would cause firm persons to apprehend a breach of peace. *See* Proposed Legislation Relating to Riots and Civil Disorders, Report and Commentary of the North Carolina Governor's Committee on Law and Order, 6 (1969) (hereinafter cited as *N. C. Riot Report*).

Following certain civil disorders that occurred in this State during April of 1968 former Governor Dan K. Moore (now an Associate Justice of this Court) requested the Governor's Committee on Law and Order (hereinafter referred to as Advisory Committee) to consider appropriate legislation for dealing with riots and other disturbances. *See N. C. Riot Report, supra,* at vi.

The legislation eventually proposed by the Advisory Committee was subsequently enacted by the North Carolina General Assembly as Section 1, Chapter 869, 1969 Session Laws, entitled "An Act to Revise and Clarify the Law Relating to Riots and Civil Disorders." This Act was codified as Article 36A of Chapter 14 of the General Statutes. G.S. 14-288.2, the provision applicable in the instant cases wherein defendant was charged with inciting and engaging in a riot, was enacted as a part of

State v. Brooks

Chapter 869, 1969 Session Laws. G.S. 14-288.2 provides as follows:

"(a) A riot is a public disturbance involving an assemblage of three or more persons which by disorderly and violent conduct, or the imminent threat of disorderly and violent conduct, results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property.

"(b) Any person who wilfully engages in a riot is guilty of a misdemeanor punishable as provided in § 14-3 (a).

"(c) Any person who wilfully engages in a riot is guilty of a felony punishable by a fine not to exceed ten thousand dollars ($10,000.00) or imprisonment for not more than five years, or both such fine and imprisonment, if:

(1) In the course and as a result of the riot there is property damage in excess of fifteen hundred dollars ($1,500.00) or serious bodily injury; or

(2) Such participant in the riot has in his possession any dangerous weapon or substance.

"(d) Any person who wilfully incites or urges another to engage in a riot, so that as a result of such inciting or urging a riot occurs or a clear and present danger of a riot is created, is guilty of a misdemeanor punishable as provided in § 14-3 (a).

"(e) Any person who wilfully incites or urges another to engage in a riot, and such inciting or urging is a contributing cause of a riot in which there is property damage in excess of fifteen hundred dollars ($1,500.00) or serious bodily injury, is guilty of a felony punishable as provided in § 14-2."

[1] G.S. 14-288.2 (a) lists the component elements that constitute the crime of riot. These elements are as follows: (1) Public disturbance; (2) Assemblage; (3) Three or more persons; (4) Disorderly and violent conduct, or the imminent threat of such conduct; and (5) Results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property. The definitional section of Arti-

cle 36A, G.S. 14-288.1, in sub-section (8), defines a "public disturbance" as follows:

"Any annoying, disturbing, or alarming act or condition exceeding the bounds of social toleration normal for the time and place in question which occurs in a public place or which occurs in, affects persons in, or is likely to affect persons in a place to which the public or a substantial group has access. The places covered by this definition shall include, but not be limited to, highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood."

"Disorderly conduct," as it applies to our fact situation, is defined by G.S. 14-288.4(a) as follows:

"Disorderly conduct is a public disturbance intentionally caused by any person who:

"(1) Engages in fighting or other violent conduct or in conduct creating the threat of imminent fighting or other violence; or

"(2) Makes or uses any utterance, gesture, display or abusive language which is intended and plainly likely to provoke violent retaliation and thereby cause a breach of the peace; . . . "

[2] Defendant contends that "[t]he very fact that correct application of 14-288.2 requires a cross-reference through this interlocking maze of statutory descriptions makes § 14-288.2 so complex and imprecise as to be unconstitutional." We fail to discern the statutory complexity alleged to exist by defendant. One purpose for codifying this offense was to *simplify* the common law by setting out in concrete form the essential elements that constitute this crime. *See N. C. Riot Report, supra,* at 6-7. This purpose has been accomplished. The key words of the statutory definition of riot are "three persons," "violent conduct," and "clear and present danger of injury or damage." *See Fuller v. Scott,* 328 F. Supp. 842 (M.D.N.C. 1971). We believe that our citizens who desire to obey this statute will have no difficulty in understanding it. These are not words so vague and imprecise that men of common intelligence and understanding must guess at their meanings. *See Coates v. City of Cincinnati,* 402 U.S. 611, 614 (1971). "The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed

to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Colten v. Kentucky,* 407 U.S. 104, 110 (1972). *See also Cox v. Louisiana,* 379 U.S. 536 (1965).

Furthermore, we do not find the reach of G.S. 14-288.2 to be so pervasive as to include activity protected by the First Amendment. A public disturbance involving three or more people, no matter how noisy or boisterous, cannot, under the statutory definition, be a riot unless *violence* or the threat of *immediate violence* which poses a clear and present danger to persons or property is present. The advocacy of imminent lawless action is not protected by the First Amendment. *See, e.g., Brandenburg v. Ohio,* 395 U.S. 444 (1969) (per curiam). The latter is the only type of speech that can come within the purview of G.S. 14-288.2.

The right of freedom of speech is not an absolute one, and the State in the exercise of its police power may punish the abuse of this freedom. *See, e.g., Stromberg v. California,* 283 U.S. 359, 368 (1931). The State has a paramount duty to maintain order not only in the streets but in schools, hospitals, and other public places. The United States Supreme Court has recognized this obligation. *See, e.g., Grayned v. Rockford,* 408 U.S. 104 (1972); *Colten v. Kentucky, supra; Feiner v. New York,* 340 U.S. 315 (1951); *Chaplinsky v. New Hampshire,* 315 U.S. 568 (1942). Accordingly, we find nothing constitutionally impermissible in our statutory definition of the offense of riot. Defendant's assignments relating to the constitutionality of G.S 14-288.2 are therefore overruled.

Defendant's motion to quash the warrants charging him with inciting a riot and with engaging in a riot also raised the question of the sufficiency of the warrants to charge the commission of criminal offenses. *See, e.g., State v. Vestal,* 281 N.C. 517, 520, 189 S.E. 2d 152, 155 (1972), and numerous cases there cited. It is essential to the jurisdiction of the court that a criminal offense be charged in the warrant upon which the State brings the defendant to trial. *See, e.g., State v. Partlow,* 272 N.C. 60, 157 S.E. 2d 688 (1967); *State v. Guffey,* 265 N.C. 331, 144 S.E. 2d 14 (1965).

[3] Defendant was charged in the second count of Warrant #73CR3893 with the offense of inciting a riot in violation of G.S. 14-288.2(d). This count contained the following language:

"And Howard Alexander Brooks at and in the county named above on or about the 24th day of March, 1973, did *unlawfully, wilfully incite a riot by urging three or more persons to congregate at Prospect School, Robeson County, North Carolina, thereby creating a clear and present danger of a riot.*" (Emphasis supplied.)

The import of the above italicized language is that the crime of inciting a riot took place when defendant urged three or more people to go to Prospect School and that the presence of three or more people at the school created the "clear and present danger of a riot." As far as we know, these allegations fail to state the commission of any criminal offense, much less the offense of inciting a riot. Any statute that would permit the State to convict an individual for urging three or more people to assemble in a public place would be constitutionally impermissible. Our riot act clearly does not encompass such activity. In fact, the scope of the act in no way infringes upon the freedom of non-violent assemblage. Hence, we hold that the trial court erred in failing to quash the second count of Warrant #73CR3893, charging defendant with inciting a riot, and that the judgment of conviction in this case is hereby arrested for the reasons set forth above. It is obvious that Warrant #73CR4822 charging "engaging in a riot" states a proper cause of action.

When these cases were called for trial in the District Court defendant's counsel filed a motion that the court provide, at the expense of the State, a stenographic reporter to take down the proceedings at the trial for use by defendant at any future trial. On 14 May 1973 District Judge McLean denied defendant's motion for a free transcript and entered the following notation for the minutes:

"(a) That this is a Court of original jurisdiction with trial de novo on appeal from this Court to the Superior Court;

"(b) That it is not customary to have a stenographic record of this Court, since trial on appeal is de novo;

"(c) That the motion of the defendant comes after the case was called by the Solicitor for trial;

"(d) That this Court has no statutory authority to provide at the State's expense a stenographic reporter in this Court;

"(e) That while Counsel for the defendant offers to have the defendant make affidavit of indigency at this time, no such affidavit has been heretofore filed, and *the defendant appears represented by privately employed counsel;*

"(f) That there is a scarcity of Court Reporters and the Court is satisfied that to provide a reporter would delay this trial which is now scheduled for its third (3rd) trial date; . . . " (Emphasis supplied.)

At the call of these cases for trial *de novo* in Superior Court, and prior to pleading in that court, defendant, still represented by the same privately employed counsel (who continues to represent defendant in this Court), moved in the alternative (1) for a remand of the cases to the District Court for a proper trial with a free transcript to be provided; or (2) for the arrest of the judgments entered by the District Court; or (3) for a dismissal of all charges because of the failure to provide him with a free transcript of the District Court proceedings. The denial of these motions by the Superior Court forms the basis for defendant's next contention. (Question #2, Assignment #2.)

Defendant argues that he has been denied his constitutional rights under the Fifth and Fourteenth Amendments to the United States Constitution and under Article 1, Sections 19 and 22, of the North Carolina Constitution due to the failure of the District Court to provide him with a free transcript. Assuming, *arguendo,* that defendant was in fact an indigent, we fail to see how the denial of his request for a free transcript violated any of his constitutional rights. Defendant strongly urges, however, that his constitutional right to the equal protection of the law has been violated in that he has been denied access to the Superior Court equal to that of an appellant who could have purchased a transcribed record of the District Court proceedings. Since this is a question of first impression before this Court, we will closely examine defendant's arguments.

The first case relied on by defendant is *Griffin v. Illinois,* 351 U.S. 12 (1956). In that case the United States Supreme

Court invalidated a state procedure that required a criminal appellant to purchase and make available a transcript of his trial to secure full appellate review. There was, however, no majority agreement of the exact constitutional basis for the decision. Four justices felt that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has. Destitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts." *Id.* at 19. Justice Frankfurter cast the deciding vote but objected on the following language: "Of course a State need not equalize economic conditions." *Id.* at 23. A number of subsequent Supreme Court cases relied on *Griffin* to strike down state practices imposing similar contingencies between the indigent and a statutory appellate right. *See, e.g., Eskridge v. Washington Prison Bd.,* 357 U.S. 214 (1958) (per curiam); *Burns v. Ohio,* 360 U.S. 252 (1959); *Smith v. Bennett,* 365 U.S. 708 (1961); *Lane v. Brown,* 372 U.S. 477 (1963).

Defendant next cites *Roberts v. LaVallee,* 389 U.S. 40 (1967) (per curiam). In that case the trial court denied defendant's [an indigent] request for a free transcript of his preliminary hearing on the basis of a New York statute requiring the payment of certain fees for such a transcript. On *certiorari* from the denial of defendant's petition for habeas corpus, the United States Supreme Court reversed the judgment dismissing the habeas petition and stated that it had "no doubt that the New York statute . . . could not meet the test of our prior decisions" which "for more than a decade now have made clear that differences in access to instruments needed to vindicate legal rights, when based upon the financial situation of the defendant, are repugnant to the Constitution." *Id.* at 42.

Defendant also relies on *Britt v. North Carolina,* 404 U.S. 226 (1971). In *Britt* defendant's three-day murder trial ended in a mistrial when the jury reported a hopeless deadlock. A retrial was scheduled for the following month. During the interim, defendant filed a motion alleging that he was indigent, and asking for a free transcript of the first trial. The trial court denied this motion and the North Carolina Court of Appeals affirmed. 8 N.C. App. 262, 174 S.E. 2d 69 (1970). We denied defendant's petition for *certiorari.* Thereafter, the United States Supreme Court granted defendant's petition for writ of *certiorari* and determined that the rule announced in *Griffin* applied to the *Britt* facts, but found that no violation of the rule had

been shown and affirmed the decision of the North Carolina
Court of Appeals.

[4]   All three of the above decisions are readily distinguishable
from the facts in the case before us. First, our *de novo* procedure
has no requirement that a defendant purchase and provide the
Superior Court with a transcript of the District Court proceed-
ings in order to secure *full* appellate review. In fact, the trial
*de novo* is not really an appeal on the record. It is a new trial
as a matter of absolute right from the beginning to the end.
It totally disregards the plea, trial, verdict, and judgment of
the District Court. *See, e.g., State v. Spencer,* 276 N.C. 535,
543, 173 S.E. 2d 765, 771 (1970). It represents a completely
fresh determination of guilt or of innocence. *See, e.g., State v.
Sparrow,* 276 N.C. 499, 173 S.E. 2d 897 (1970), *cert. denied,*
403 U.S. 940 (1971).

Second, there is no statutory requirement in this State
that a transcript of the District Court proceedings be main-
tained. Generally, such transcripts are not available, even for
a fee.

Finally, we find no merit in the argument that a transcript
of the District Court proceedings is needed for an effective
appeal for trial *de novo* in Superior Court. In *Colten v. Ken-
tucky, supra,* the United States Supreme Court found no consti-
tutional infirmity in a Kentucky statutory scheme (almost
identical to the *de novo* procedures under G.S. 7A-290) in which
the judge in the *de novo* court was empowered to sentence anew
and was not bound to stay within the limits of the sentence im-
posed by the inferior court. The following language from Mr.
Justice White's majority opinion is relevant:

> "The trial de novo represents a completely fresh deter-
> mination of guilt or innocence. It is not an appeal on the
> record. . . . [T]he record from the lower court is not before
> the superior court and is irrelevant to its proceedings. . . .
>
> \*   \*   \*   \*   \*
>
> "Proceedings in the inferior courts are simple and
> speedy, and, if the results . . . are any evidence, the penalty
> is not characteristically severe. Such proceedings offer a
> defendant the opportunity to learn about the prosecution's
> case and, if he chooses, he need not reveal his own. He
> may also plead guilty without a trial and promptly secure
> a de novo trial in a court of general criminal jurisdiction.

He cannot, and will not, face the realistic threat of a prison sentence in the inferior court without having the help of counsel, whose advice will also be available in determining whether to seek a new trial, with the slate wiped clean, or to accept the penalty imposed by the inferior court. The State has no such options. Should it not prevail in the lower court, the case is terminated, whereas the defendant has the choice of beginning anew. In reality his choices are to accept the decision of the judge and the sentence imposed in the inferior court or to reject what in effect is no more than an offer in settlement of his case and seek the judgment of the judge or jury in the superior court, with sentence to be determined by the full record made in that court . . . . " 407 U.S. at 117-18, 118-19.

We agree with the United States Supreme Court in *Colten* that the judgment of the District Court in this type of case is, in essence, no more than an offer to defendant in settlement of his case. Defendant is free to accept this offer or to appeal to the Superior Court and seek the judgment of a jury with their verdict to be determined *solely* upon the evidence adduced in the Superior Court. In this factual situation, we fail to see any equal protection problems.

The purpose of our *de novo* procedure is to provide all criminal defendants charged with misdemeanor violations the right to a "speedy trial" in the District Court and to offer them an opportunity to learn about the State's case without revealing their own. In the latter sense, this procedure can be viewed as a method of "free" criminal discovery. It would necessarily destroy the underlying purposes of the *de novo* system to hold that every indigent defendant is entitled to a free transcript of the District Court proceedings. We do not think that either the Federal or the State Constitution requires such a result. Therefore, for the reasons above stated, we hold that there are no constitutional infirmities in the denial of a free transcript of the District Court proceedings to an indigent defendant. Hence, this assignment is overruled.

[5]  Defendant next contends (Question #4, Assignment #5) that certain real evidence was improperly admitted over his objection. Specifically, defendant complains about the State's introduction of a piece of iron pipe, a revolver, two shotguns, a machete, and two jugs containing an amber fluid, all of which

were found at the scene of the disorder shortly after defendant was arrested. Defendant argues that this evidence was irrelevant and immaterial and therefore should have been excluded. We disagree. Under G.S. 14-288.2(a), *supra,* the *capacity* of members of the assemblage to inflict injury or damage to persons or property or to create the clear and present danger of such injury or damage is material to the crime of riot and is relevant to establish the proposition defendant was engaged in a riot. Certainly, the probability of violence or the severity of possible injuries was significantly enhanced by the presence of the weapons above described. Furthermore, several of the State's witnesses testified that they heard gunshots and saw several of the admitted items before the arrests took place. "Whatever the jury may learn through the ear from descriptions given by witnesses, they may learn directly through the eye from the objects described." 1 Stansbury's N. C. Evidence § 117 (Brandis Rev. 1973) (hereinafter cited as 1 Stansbury).

Defendant also asserts that the above evidence should have been excluded because its only effect was to confuse the issues and to excite prejudice against him. We agree that this evidence prejudiced defendant's case. However, "when a re'evant object is brought into the courtroom and produced for exhibition in the regular course of the trial, its exclusion from evidence is not required simply because it may have undue weight with the jury. This is true of a living person as well as of an inanimate object." 1 Stansbury, *supra,* at § 117. *Accord, State v. Wilson,* 280 N.C. 674, 187 S.E. 2d 22 (1972) ; *State v. Dobbins,* 277 N.C. 484, 178 S.E. 2d 449 (1971) ; *State v. Fox,* 277 N.C. 1, 175 S.E. 2d 561 (1970) ; *State v. Sneeden,* 274 N.C. 498, 164 S.E. 2d 190 (1968) ; *State v. Arsad,* 269 N.C. 184, 152 S.E. 2d 99 (1967). "It is not a valid ground of objection to evidence that it tends to prove the fact in question more conclusively when the article to which it refers is exhibited, instead of being left to the description of witnesses." 1 Stansbury, *supra,* at § 118. For the above stated reasons, this assignment is overruled.

[6]   Finally, defendant contends (Question #3, Assignment #4) that the trial court committed error by failing to grant his motions for a mistrial and by failing to properly instruct the jury upon certain alleged acts of prosecutorial misconduct. We have carefully reviewed the record and, although we disapprove of some of the actions of the district attorney, we fail to see how they resulted in denying defendant his right to a

fair trial. *See, e.g., State v. Stegmann,* 286 N.C. 638, 213 S.E. 2d 262 (1975) ; *State v. Monk,* 286 N.C. 509, 212 S.E. 2d 125 (1975) ; *State v. McCall,* 286 N.C. 472, 212 S.E. 2d 132 (1975), and numerous cases cited in these opinions. Also, we do not believe that the trial court abused its discretion in denying defendant's motions for mistrial. In fact, the record reveals that on one occasion the trial court asked defendant's counsel if he really wanted a mistrial on the basis of the district attorney's statements to the jury and defendant's counsel said that he was "just making the motion." Accordingly, this assignment is overruled.

Except for the restraint exercised by the police officers on the occasion in question, the crimes for which defendant was tried may well have been of a more serious nature. We believe defendant has had a fair trial, free from prejudicial error, and therefore the judgment of the Court of Appeals as it pertains to defendant's conviction for "engaging in a riot" is affirmed. However, that portion of the decision below finding no error in defendant's conviction for "inciting a riot" is reversed in that we have deemed it appropriate to arrest the judgment in this case for the reasons previously stated.

Therefore, the result of our decision is as follows:

As to "Engaging in a Riot"—affirmed.

As to "Inciting a Riot"—reversed and judgment arrested.